# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket Nos. 45381, 45382, 45383, 45384

| | |
|---|---|
| In Re: CSRBA Case No. 49576 )<br>Subcase No. 91-7755 )<br>(353 Consolidated Subcases). )<br><br>)<br>UNITED STATES OF AMERICA and )<br>COEUR D'ALENE TRIBE, )<br><br>)<br>Claimants-Respondents on Appeal, )<br><br>)<br>v. )<br><br>)<br>STATE OF IDAHO, )<br><br>)<br>Objector-Appellant on Appeal, )<br><br>)<br>and )<br><br>)<br>HECLA MINING, CITY OF COEUR )<br>D'ALENE, HAGADONE HOSPITALITY )<br>CO., HARMON PROPERTY OWNERS )<br>ASSN., NORTH KOOTENAI WATER & )<br>SEWER, PINEHURST WATER DISTRICT, )<br>POTLATCH FOREST HOLDINGS, INC., )<br>POTLATCH LAND & LUMBER, LLC, )<br>POTLATCH TRS IDAHO, LLC, BENEWAH )<br>COUNTY BOARD OF COMMISSIONERS, )<br>BUELL BROS, INC., JACK A. BUELL, )<br>ELEANOR L. BUELL, CITY OF )<br>HARRISON, CITY OF ST. MARIES, )<br>WHITEMAN LUMBER CO., INC., NORTH )<br>IDAHO WATER RIGHTS GROUP, )<br>RATLIFF FAMILY LLC #1, JOHN T. )<br>MCFADDIN, RONALD D. HEYN, and )<br>WILLIAM M. GREEN, )<br><br>)<br>Objectors, )<br><br>)<br>and )<br><br>)<br>AVISTA CORPORATION, )<br><br>)<br>Respondent. )<br>_____ ) | Boise, November 2018 Term<br><br>Filed: September 5, 2019<br><br>Karel A. Lehrman, Clerk |

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Claimant-Appellant on Appeal　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
STATE OF IDAHO, HECLA MINING,　　)
NORTH IDAHO WATER RIGHTS　　　　)
ALLIANCE, NORTH WEST PROPERTY　)
OWNERS ALLIANCE, COEUR D'ALENE　)
LAKESHORE PROPERTY OWNERS　　　)
ASSOCIATION, RATHDRUM POWER,　　)
LLC, HAGADONE HOSPITALITY CO.,　　)
　　　　　　　　　　　　　　　　　　)
　　　Objectors-Respondents on Appeal　)
　　　　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
CITY OF COEUR D'ALENE, HARMON　)
PROPERTY OWNERS ASSN., NORTH　　)
KOOTENAI WATER & SEWER,　　　　　)
PINEHURST WATER DISTRICT,　　　　)
POTLATCH FOREST HOLDINGS, INC.,　)
POTLATCH LAND & LUMBER, LLC,　　)
POTLATCH TRS IDAHO, LLC, BENEWAH )
COUNTY BOARD OF COMMISSIONERS,　)
BUELL BROS, INC., JACK A. BUELL,　)
ELEANOR L. BUELL, CITY OF　　　　)
HARRISON, CITY OF ST. MARIES,　　)
WHITEMAN LUMBER CO., INC., COEUR )
D'ALENE TRIBE, RATLIFF FAMILY LLC )
#1, JOHN T. MCFADDIN, RONALD D.　)
HEYN, and WILLIAM M. GREEN,　　　)
　　　　　　　　　　　　　　　　　　)
　　　Objectors　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
AVISTA CORPORATION,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Respondent.　　　　　　　　　)
─────────────────────────────)
COEUR D'ALENE TRIBE,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Claimant-Appellant on Appeal　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

2

v.                                                   )
                                                     )
**STATE OF IDAHO, HECLA MINING,**                    )
**NORTH IDAHO WATER RIGHTS**                         )
**ALLIANCE, NORTH WEST PROPERTY**                    )
**OWNERS ALLIANCE, COEUR D'ALENE**                   )
**LAKESHORE PROPERTY OWNERS**                        )
**ASSOCIATION, RATHDRUM POWER,**                     )
**LLC, HAGADONE HOSPITALITY CO.,**                   )
                                                     )
       **Objectors-Respondents,**     )
                                                     )
**and**                                              )
                                                     )
**CITY OF COEUR D'ALENE, HARMON**                    )
**PROPERTY OWNERS ASSN., NORTH**                     )
**KOOTENAI WATER & SEWER,**                          )
**PINEHURST WATER DISTRICT,**                        )
**POTLATCH FOREST HOLDINGS, INC.,**                  )
**POTLATCH LAND & LUMBER, LLC,**                     )
**POTLATCH TRS IDAHO, LLC, BENEWAH**                 )
**COUNTY BOARD OF COMMISSIONERS,**                   )
**BUELL BROS, INC., JACK A. BUELL,**                 )
**ELEANOR L. BUELL, CITY OF**                        )
**HARRISON, CITY OF ST. MARIES,**                    )
**WHITEMAN LUMBER CO., INC.,  UNITED**               )
**STATES OF AMERICA, RATLIFF**                       )
**FAMILY LLC #1, JOHN T. MCFADDIN,**                 )
**RONALD D. HEYN, and WILLIAM M.**                   )
**GREEN,**                                           )
                                                     )
       **Objectors.**     )
**and**                                              )
                                                     )
**AVISTA CORPORATION,**                              )
                                                     )
    **Respondent.**     )
                                                     )
**UNITED STATES OF AMERICA, and**                    )
**COEUR D'ALENE TRIBE,**                             )
                                                     )
       **Claimants-Respondents,**     )
v.                                                   )
                                                     )
**NORTH IDAHO WATER RIGHTS**                         )
**ALLIANCE, NORTH WEST PROPERTY**                    )

OWNERS ALLIANCE, COEUR D'ALENE )
LAKESHORE PROPERTY OWNERS )
ASSOCIATION, RATHDRUM POWER, )
LLC, HAGADONE HOSPITALITY CO., )
)
           **Objectors-Appellants.** )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Eric J. Wildman, District Judge.

The judgment of the district court is <u>affirmed in part and reversed in part</u>.

Lawrence G. Wasden, Idaho Attorney General, Boise, for the State of Idaho. Steven W. Strack argued.

United States Department of Justice, Environment & Natural Resources Division, Washington, D.C. and Boise, for the United States of America. Erica B. Kranz argued.

Sonosky, Chambers, Sachse, Mielke & Brownell, LLP, Albuquerque, NM, and Office of Legal Counsel Coeur d'Alene Tribe, Plummer, for the Coeur d'Alene Tribe. Vanessa L. Ray-Hodge argued.

Barker Roshold & Simpson LLP, Boise, for Hecla Mining. Albert P. Barker argued.

Parsons Behle & Latimer, Boise, for North Idaho Water Rights Alliance, et al., Norman M. Semanko argued.

———————————

STEGNER, Justice.

These four appeals arise from a consolidated subcase that is a part of the broader Coeur d'Alene-Spokane River Basin Adjudication (CSRBA).[1] The United States Department of the Interior[2] (the United States), as trustee for the Coeur d'Alene Tribe (the Tribe), filed 353 claims in Idaho state court seeking judicial recognition of federal reserved water rights to fulfill the purposes of the Coeur d'Alene Tribe's Reservation (the Reservation).[3] The Tribe joined the

---

[1] The CSRBA is a "comprehensive determination of the nature, extent, and priority of" all surface and ground water rights in the Coeur d'Alene-Spokane River Basin water system in Idaho. *See* I.C. § 42-1406B. Pursuant to Idaho Code section 42-1406B, the Director of the Idaho Department of Water Resources filed a petition with the district court to initiate the CSRBA. The district court granted the petition and initiated the general adjudication on November 12, 2008.

[2] Although the Department of the Interior, Bureau of Indian Affairs, filed the claims on behalf of the Tribe, it gave notice that the Department of Justice would represent it in the CSRBA.

[3] The United States is a litigant in state court in Idaho because, for purposes of this type of litigation, it has waived sovereign immunity. 43 U.S.C. § 666.

litigation. The State of Idaho (the State) and others objected to the claims asserted by the United States and the Tribe. The district court bifurcated the proceedings to decide only the entitlement to water at this stage, with the quantification stage to follow. After cross-motions for summary judgment, the district court allowed certain claims to proceed and disallowed others.

The district court specifically allowed reserved water rights for agriculture, fishing and hunting, and domestic purposes. The district court allowed reserved water rights for instream flows within the Reservation, but disallowed those for instream flows outside the Reservation. The district court disallowed other claims, including a claim on behalf of the Tribe to maintain the level of Lake Coeur d'Alene. The district court then determined priority dates for the various claims it found should proceed to quantification. Generally speaking, the district court held that the Tribe was entitled to a date-of-reservation priority date for the claims for consumptive uses, and a time immemorial priority date for nonconsumptive uses. However, in regard to lands homesteaded on the Reservation by non-Indians that had since been reacquired by the Tribe, the district court ruled the Tribe was entitled to a priority date of a perfected state water right, or if none had been perfected or it had been lost due to nonuse, the Tribe's priority date would be the date-of-reacquisition.

The district court's holdings are now the subject of appeals by the State of Idaho (Supreme Court Docket No. 45381), the United States (Supreme Court Docket No. 45382), the Tribe (Supreme Court Docket No. 45383), and a group of private parties who will collectively be referred to as the North Idaho Water Rights Group (the NIWRG)[4] (Supreme Court Docket No. 45384). Because all of the appeals arise out of the same decisions of the district court and significantly overlap one another, we will address them together in one opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. History of the Tribe and the Reservation.

In its summary judgment order, the district court adopted the history of the Tribe and the creation of the Reservation as set out by the United States Supreme Court in *Idaho v. United*

---

[4] NIWRG refers to the following parties: North Idaho Water Rights Alliance; Members of the North West Property Owners Alliance; Members of the Coeur d'Alene Lakeshore Property Owners Association; Rathdrum Power, LLC; and Hagadone Hospitality Co. Hecla Mining, a respondent in both the United States' and the Tribe's appeals, is not included within the acronym NIWRG.

*States* (hereafter *Idaho II*), 533 U.S. 262 (2001). That history, as articulated by the U.S. Supreme Court, is as follows:

> The Coeur d'Alene Tribe once inhabited more than 3.5 million acres in what is now northern Idaho and northeastern Washington, including the area of Lake Coeur d'Alene and the St. Joe River. Tribal members traditionally used the lake and its related waterways for food, fiber, transportation, recreation, and cultural activities. The Tribe depended on submerged lands for everything from water potatoes harvested from the lake to fish weirs and traps anchored in riverbeds and banks.

> . . . In 1867, in the face of immigration into the Tribe's aboriginal territory, President Johnson issued an Executive Order setting aside a reservation of comparatively modest size, although the Tribe was apparently unaware of this action until at least 1871, when it petitioned [Tribe's 1872 Petition] the Government to set aside a reservation. The Tribe found the 1867 boundaries unsatisfactory, due in part to their failure to make adequate provision for fishing and other uses of important waterways. When the Tribe petitioned the Commissioner of Indian Affairs a second time, it insisted on a reservation that included key river valleys because "we are not as yet quite up to living on farming" and "for a while yet we need [to] have some hunting and fishing."

> Following further negotiations, the Tribe in 1873 agreed to relinquish (for compensation) all claims to its aboriginal lands outside the bounds of a more substantial reservation that negotiators for the United States agreed to "set apart and secure" "for the exclusive use of the Coeur d'Alene Indians, and to protect . . . from settlement or occupancy by other persons." The reservation boundaries described in the agreement covered part of the St. Joe River (then called the St. Joseph), and all of Lake Coeur d'Alene except a sliver cut off by the northern boundary.

> Although by its own terms the agreement was not binding without congressional approval, later in 1873 President Grant issued an Executive Order directing that the reservation specified in the agreement be "withdrawn from sale and set apart as a reservation for the Coeur d'Alene Indians." The 1873 Executive Order set the northern boundary of the reservation directly across Lake Coeur d'Alene . . . .

> As of 1885, Congress had neither ratified the 1873 agreement nor compensated the Tribe. This inaction prompted the Tribe to petition the Government again [Tribe's 1885 Petition], to "make with us a proper treaty of peace and friendship . . . by which your petitioners may be properly and fully compensated for such portion of their lands not now reserved to them; [and] that their present reserve may be confirmed to them." In response, Congress authorized new negotiations to obtain the Tribe's agreement to cede land outside the borders of the 1873 reservation. In 1887, the Tribe agreed to cede

>> "all right, title, and claim which they now have, or ever had, to all lands in said Territories [Washington, Idaho, and Montana] and

6

elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation."

The Government, in return, promised to compensate the Tribe, and agreed that

"[i]n consideration of the foregoing cession and agreements . . . the Coeur d'Alene Reservation shall be held forever as Indian land and as homes for the Coeur d'Alene Indians . . . and no part of said reservation shall ever be sold, occupied, open to white settlement, or otherwise disposed of without the consent of the Indians residing on said reservation."

As before, the agreement was not binding on either party until ratified by Congress.

In January 1888, not having as yet ratified any agreement with the Tribe, the Senate expressed uncertainty about the extent of the Tribe's reservation and adopted a resolution directing the Secretary of the Interior to "inform the Senate as to the extent of the present area and boundaries of the Coeur d'Alene Indian Reservation in the Territory of Idaho," and specifically, "whether such area includes any portion, and if so, about how much of the navigable waters of Lake Coeur d'Alene, and of Coeur d'Alene and St. Joseph Rivers." The Secretary responded in February 1888 with a report of the Commissioner of Indian Affairs, stating that "the reservation appears to embrace all the navigable waters of Lake Coeur d'Alene, except a very small fragment cut off by the north boundary of the reservation," and that "[t]he St. Joseph River also flows through the reservation." . . .

. . . .

Congress was not prepared to ratify the 1887 agreement, however, owing to a growing desire to obtain for the public not only any interest of the Tribe in land outside the 1873 reservation, but certain portions of the reservation itself. . . .

But Congress did not simply alter the 1873 boundaries unilaterally. Instead, the Tribe was understood to be entitled beneficially to the reservation as then defined, and the 1889 Indian Appropriations Act included a provision directing the Secretary of the Interior "to negotiate with the Coeur d'Alene tribe of Indians," and, specifically, to negotiate "for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell." Later that year, the Tribe and Government negotiators reached a new agreement under which the Tribe would cede the northern portion of the reservation, including approximately two-thirds of Lake Coeur d'Alene, in exchange for $500,000. The new boundary line, like the old one, ran across the lake, and General Simpson, a negotiator for the United States, reassured the Tribe that "you still have the St. Joseph River and the

7

lower part of the lake." And, again, the agreement was not to be binding on either party until both it and the 1887 agreement were ratified by Congress.

. . . .

. . . On March 3, 1891, Congress "accepted, ratified, and confirmed" both the 1887 and 1889 agreements with the Tribe.

*Idaho II*, 533 U.S. at 265–71 (citations and footnotes omitted).

### B. Procedural history.

The State, the United States, the Tribe, and the NIWRG have all filed separate appeals, challenging a series of orders entered by the district court in the overarching consolidated CSRBA Subcase No. 91-7755. The procedural history pertaining to all four appeals is outlined below.

On March 26, 2014, the United States filed 353 claims asserting an entitlement to federal reserved water rights on behalf of the Tribe in the CSRBA. Those claims were divided into six categories: (1) 17 domestic, commercial, municipal, and industrial claims; (2) 72 instream flow claims (involving streams both within and outside the Reservation) for maintenance of fish habitat; (3) 44 irrigated agriculture claims; (4) 1 lake level maintenance claim; (5) 24 claims for springs and seeps; and (6) 195 wetlands claims. All of these claims were pursued under federal law as implied federal reserved water rights. The district court consolidated the claims into the subcase from which the four instant appeals arise. The district court divided litigation of the claims into an entitlement phase and a quantification phase. These appeals involve only the entitlement phase. The quantification phase will proceed once the entitlement phase of the case has been resolved. Multiple summary judgment motions were filed regarding the Tribe's purported entitlement to its various water rights claims.

On May 3, 2017, the district court issued a summary judgment order. Initially, the district court found that when the Reservation was created, Congress impliedly reserved water rights for the Tribe's use. In order to determine the claims to which the Tribe was entitled, the district court first determined reserved water rights could be implicitly reserved for only the primary purposes of the Reservation. The district court found that agriculture, fishing and hunting, and domestic purposes were the primary purposes of the Reservation, and therefore limited the Tribe's claims to those purposes.

The district court further found in its summary judgment order that the Tribe was not entitled to the following water rights claims: claims based on a homeland purpose theory; claims

based on secondary purposes (including industrial, commercial, aesthetics, recreation, and others); claims outside of the boundaries of the Reservation; and the claim for lake level maintenance of Lake Coeur d'Alene. The district court parsed certain water rights claims, disallowing some portions of the claims and allowing others. As a result, the district court entered a second order later in the day on May 3, 2017, disallowing eighty-four claims (order disallowing claims) concluding that those were based on what it considered improper legal grounds.

The summary judgment order also set out the priority dates for different types of water rights claims. The district court found that the Reservation had been created on November 8, 1873; consequently, claims for agricultural use and domestic use (including claims for groundwater) were given that priority date. Claims based on hunting and fishing were given a priority date of time immemorial. Finally, the district court held that the priority date for claims associated with land homesteaded on the Reservation by non-Indians, which had been subsequently reacquired by the Tribe, was the earlier date of either a perfected state water right "or if no water right was so perfected, then the date of reacquisition."

Shortly thereafter, the State filed a motion to reconsider the summary judgment order and the United States and the Tribe filed a joint motion to modify the order disallowing claims. The district court issued orders ruling on both the motion to reconsider and the motion to modify on July 26, 2017 (order granting reconsideration and order granting modification, respectively).

The order granting reconsideration clarified priority dates for springs and wetlands on homesteaded lands reacquired by the Tribe, as well as the priority date for claims associated with Reservation lands sold to (but not homesteaded by) non-Indians which were then reacquired by the Tribe. The district court determined the priority date for reacquired springs and wetlands was also either the date perfected by the homesteader under state law, or, if the homesteader had never perfected a claim or had allowed it to lapse, the date of reacquisition. The district court further concluded that claims associated with lands originally allotted to Indians, which were then sold to non-Indians and subsequently reacquired by the Tribe, would carry a priority date of November 8, 1873, the date of the Reservation. However, in the context of these reacquired allotted lands, the district court clarified that any non-diversionary springs or wetlands claims, as well as consumptive claims lost to nonuse, carried a date-of-reacquisition priority date.

9

The order granting modification did not change the list of acceptable primary purposes of the Reservation. The district court did, however, conclude that instream flows for fish habitat within the boundary of the Reservation had been erroneously disallowed in its previous order. As a result of this error, the district court issued an amended order on July 26, 2017, reinstating fifteen claims that had been disallowed. (The district court did not distinguish between claims on lands within the Reservation but not owned by the Tribe, and claims on tribal-owned lands within the Reservation.)

In total, the district court signed six separate orders on two separate days. On May 3, 2017, the district court entered the following orders: (1) order granting and denying summary judgment; (2) order disallowing certain claimed purposes of the Reservation; and (3) order disallowing claims (which was later determined to be partially erroneous). On July 26, 2017, the district court entered the following orders: (4) order granting reconsideration (which clarified priority dates established in the summary judgment order); (5) order granting modification (which upheld the denial of a plant-gathering purpose and explained what claims had been erroneously disallowed); and (6) an amended order disallowing claims (which removed fifteen erroneously disallowed claims from the previous order).

## C.    Claims, docket numbers, and alignment of parties on appeal.

The State appeals, contesting the claims to water rights granted by the district court to the United States and the Tribe. The United States and the Tribe are the respondents in the State's appeal. The State's appeal was given Docket No. 45381.

As trustee for the Tribe, the United States appeals the claims to water rights it made on behalf of the Tribe that were denied at summary judgment. The State, the NIWRG, and Hecla Mining are respondents in the United States' appeal (these respondents will be collectively referred to as the Objectors). The United States' appeal was given Docket No. 45382.

The Tribe also appeals, arguing the district court erred in rejecting the Tribe's claims. The arguments put forth in the appeals of the Tribe and the United States are closely aligned (if not identical). The issues argued in briefing by the Tribe echo those argued by the United States, and seek to overturn the district court's rulings that were unfavorable to the Tribe. The Objectors are also the respondents in the Tribe's appeal and their briefs are identical to the ones they filed in the United States' appeal. The Tribe's appeal was given Docket No. 45383.

The NIWRG appeals, arguing the district court erred by allowing certain water rights claims of the United States and the Tribe. The United States and the Tribe are the respondents in the NIWRG's appeal. The NIWRG's appeal was given Docket No. 45384.

## II.     STANDARD OF REVIEW

"In an appeal from an order granting summary judgment, the Court applies the same standard of review as that used by the district court when originally ruling on the motion." *Potlatch Corp. v. United States*, 134 Idaho 916, 919, 12 P.3d 1260, 1263 (2000) (citing *Mitchell v. Bingham Mem'l Hosp.*, 130 Idaho 420, 422, 942 P.2d 544, 546 (1997)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "The determination is to be based on the pleadings, depositions, and admissions on file, together with the affidavits, if any." *Potlatch Corp.*, 134 Idaho at 919, 12 P.3d at 1263 (citing *Mitchell*, 130 Idaho at 422, 942 P.2d at 546). When the district court is the trier of fact, it is entitled to arrive at the most probable inferences based upon the evidence properly before it. *P.O. Ventures, Inc. v. Loucks Family Irrevocable Tr.*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007) (citation omitted). "This Court exercises free review over the entire record that was before the district judge to determine whether either side was entitled to judgment as a matter of law and reviews the inferences drawn by the district judge to determine whether the record reasonably supports those inferences." *Id.* (citation omitted).

## III.  ANALYSIS

### A.     The law regarding federal reserved water rights.

"The existence or absence of a reserved water right is a matter of federal law." *United States v. Idaho*, 135 Idaho 655, 660, 23 P.3d 117, 122 (2001). The federal government "does not defer to state water law with respect to reserved rights." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.* (hereafter *Agua Caliente*), 849 F.3d 1262, 1269 (9th Cir. 2017).

Federal reserved water rights arise from the United States Supreme Court's decision in *Winters v. United States*, 207 U.S. 564 (1908). In *Winters*, the Supreme Court held that when Congress created an Indian reservation, it also, by implication, reserved water necessary for the Tribe to achieve the purposes of the reservation. *Id.* at 576. "In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water." *Cappaert v.*

11

*United States*, 426 U.S. 128, 139 (1976) (citing *Arizona v. California* (hereafter *Arizona I*), 373 U.S. 546, 598 (1963), *judgment entered sub nom. Arizona v. California* (hereafter *Arizona II*), 376 U.S. 340 (1964), *amended sub nom. Arizona v. California* (hereafter *Arizona III*), 383 U.S. 268 (1966), *and amended sub nom. Arizona v. California* (hereafter *Arizona V*), 466 U.S. 144 (1984)); *Winters*, 207 U.S. at 576). Intent to reserve water is inferred if the waters are necessary to accomplish the reservation's purposes. *Cappaert*, 426 U.S. at 139.

The Supreme Court held that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Id.* at 138. Reservation purposes are derived from "the document[s] and circumstances surrounding [a reservation's] creation, and the history of the Indians for whom it was created." *Agua Caliente*, 849 F.3d at 1270 (quoting *Colville Confederated Tribes v. Walton* (hereafter *Walton I*), 647 F.2d 42, 47 (9th Cir. 1981)); *see also Winters*, 207 U.S. at 575 ("The case . . . turns on the agreement . . . resulting in the creation of [the] . . . Reservation."). Once established, "the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators." *Cappaert*, 426 U.S. at 138.

### B.   The Reservation was created by the Executive Order of November 8, 1873.

As a preliminary matter, it is important to determine what governmental act or acts created the Reservation. Implied federal reserved water rights are established *at the time surrounding the creation* of the reservation. *Arizona I*, 373 U.S. at 600 ("We follow [*Winters*] now and agree that the United States did reserve the water rights for the Indians effective as of the time the Indian Reservations were created.").

Likewise, a reservation's purposes that require water are also determined at the time surrounding the reservation's creation. *See Cappaert,* 426 U.S. at 138 ("[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation[, and] . . . acquires a reserved right . . . which vests on the date of the reservation . . . ."); *Walton I*, 647 F.2d at 47 ("To identify the purposes for which the Colville Reservation was created, we consider the document and circumstances surrounding its creation, and the history of the Indians for whom it was created.").

12

Accordingly, establishing when and how the Reservation was created is integral to determining both the potential purposes of the Tribe and priority dates of certain water rights claims—the central contested issues in these appeals.

Federal reservations and accompanying reserved water rights may be created by executive order. *Arizona I*, 373 U.S. at 598; *see also United States v. New Mexico*, 438 U.S. 696, 699–700 (1978) (President has power to reserve unappropriated water). Indian reservations which are set aside by the executive branch remain valid even absent congressional approval. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 325–26 (1942). "[S]o far as the power to withdraw public lands from sale is concerned, such a delegation could be spelled out from long continued Congressional acquiescence in the executive practice." *Id.* at 326 (discussing *United States v. Midwest Oil Co.*, 236 U.S. 459, 469–71 (1915)).

The United States Supreme Court and Ninth Circuit have held that the Coeur d'Alene Reservation was established by the 1873 Executive Order. *E.g.*, *Idaho II*, 533 U.S. at 277, 279; *Idaho v. Andrus*, 720 F.2d 1461, 1463 (9th Cir. 1983). The district court also found the Reservation was created by President Grant's Executive Order of November 8, 1873. We conclude the district court's finding in this regard was correct.

The State argues that the 1873 Agreement was null and void if not approved by Congress. However, the 1873 Executive Order, separate from the 1873 Agreement, is sufficient to create the Reservation. *See, e.g.*, *Sioux Tribe of Indians*, 316 U.S. at 325–26. Accordingly, the Reservation and any implied water rights were created in 1873 by the executive order. *See Arizona I*, 373 U.S. at 600. It follows that the Reservation's purposes requiring water must also be established as they were at that time. Therefore, the 1873 documents (both the executive order and the agreement) and surrounding documents and circumstances (i.e., the Tribe's 1872 Petition) will be used to determine the purposes of the Reservation. *See Walton I*, 647 F.2d at 47. Additionally, it is appropriate to examine the later 1887 and 1889 Tribal Agreements (the later agreements), which were approved by Congress in the 1891 Act, to aid in understanding the Reservation's purposes.

### C. The 1887 and 1889 Agreements and 1891 Act of Congress do not limit the Reservation's purposes and may be used to derive the Reservation's purposes.

The State argues that the later agreements and accompanying 1891 Act of Congress created the Reservation and define and substantially limit the Reservation's purposes.

13

Accordingly, the State contends that the 1873 Agreement and Executive Order should not be used to determine the date of the Reservation's creation or its purposes. The United States and the Tribe counter that the question of which governmental act establishes the purposes of the Reservation has already been decided by the United States Supreme Court's decision in *Idaho II*. 533 U.S. at 262. However, as will be shown, *Idaho II* is not conclusive as to the Reservation's purposes.

      1.  <u>Issue preclusion does not bar issues regarding the Reservation's purposes</u>.

As noted, the State claims that the later agreements and accompanying 1891 Act of Congress created the Reservation and limit its purposes. The Tribe and the United States respond that the issue of whether the Reservation's purposes were curtailed by later congressional action is barred by issue preclusion, as *Idaho II* already established the Reservation's purposes. The State counters that the issue of whether the original purposes of hunting and fishing were ratified (or abrogated) by the 1891 Act was not resolved in *Idaho II*, and thus issue preclusion does not apply.

> Whether claim preclusion or issue preclusion bars relitigation between the same parties of a prior litigation is a question of law upon which this Court exercises free review. *Lohman v. Flynn,* 139 Idaho 312, 319, 78 P.3d 379, 386 (2003). *Res judicata* is an affirmative defense and the party asserting it must prove all of the essential elements by a preponderance of the evidence. *Foster v. City of St. Anthony,* 122 Idaho 883, 890, 841 P.2d 413, 420 (1992).

*Stilwyn, Inc. v. Rokan Corp.*, 158 Idaho 833, 838–39, 353 P.3d 1067, 1072–73 (2015) (quoting *Ticor Title Co. v. Stanion,* 144 Idaho 119, 122, 157 P.3d 613, 616 (2007)). Issue preclusion based on a federal judgment is governed by federal common law. *Id.* at 839, 353 P.3d at 1073 (citing *Taylor v. Sturgell,* 553 U.S. 880, 891 (2008)).

Under issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984) (citing *Montana v. United States,* 440 U.S. 147, 153 (1979)).

> The party asserting issue preclusion must demonstrate: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012).

*Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017).

14

In *Idaho II*, the question presented involved an inquiry to determine whether submerged lands, those lying below Lake Coeur d'Alene on the Reservation, were subject to a federal reservation or instead reverted to Idaho upon its admission to the Union. *Idaho II*, 533 U.S. at 273. The two-step inquiry in that case asked "whether Congress intended to include land under navigable waters within the federal reservation and, if so, whether Congress intended to defeat the future State's title to the submerged lands." *Id.* (citations omitted). The Court further set out two sub-elements to the second inquiry: "whether Congress was on notice that the Executive reservation included submerged lands, and whether the *purpose of the reservation* would have been compromised if the submerged lands had passed to the State." *Id.* at 273–74 (italics added) (citations omitted).

At first glance, it appears the test in *Idaho II* necessarily encompassed a determination of the purposes of the Reservation. However, upon closer examination, *Idaho II* focused on congressional intent regarding the submerged lands and did not explicitly analyze the purposes of the Reservation. *See id.* at 273–281. Thus, the issue in *Idaho II* does not involve the same question as the appeals here. Consequently, the first element (requiring identical issues be involved in both cases) of issue preclusion has not been met. In addition, element two of issue preclusion has not been satisfied for the same reason: the purposes of the Reservation were not "actually litigated and decided in" *Idaho II*. *Howard*, 871 F.3d at 1041. Likewise, because the purposes of the Reservation issue was not actually addressed in *Idaho II*, it cannot be said that determining the purposes of the Reservation "was necessary to decide the merits" of *Idaho II*. *Id.* Thus, element four of issue preclusion is also not satisfied, and *Idaho II* does not appear to preclude this Court's determination of this issue.

Because of the Supreme Court's limited holding in *Idaho II*, elements one, two, and four of issue preclusion have not been established and issue preclusion does not apply to these appeals. Accordingly, the arguments brought by the State that the later agreements superseded the original purposes of the Reservation need to be analyzed.

2. The later agreements do not constitute a "change in condition" in the Reservation, and therefore, do not prevent the 1873 Executive Order from establishing the purposes of the Reservation.

The State contends that the 1873 Executive Order should not be the basis for determining the purposes of the Reservation because the later Agreements resulted in a "change in the conditions of the Reservation." The State also argues that the later agreements (incorporated by

15

Congress in the 1891 Act) identify agriculture as the sole purpose of the Reservation, and thus superseded any purposes established at the time of the 1873 Reservation. The State also maintains that these later agreements are the appropriate formative documents from which the Reservation's purposes should be derived. The Tribe and the United States argue that no change in condition occurred; rather, they contend the later agreements, as well as the 1891 Act, ratified the original 1873 Reservation and its purposes.

More specifically, the State argues that because the later agreements only address the Tribe's transition to an agricultural-based economy (thus evidencing a change in conditions), that every other purpose has been lost. The State maintains that *Arizona I* supports this argument because the Court in that case contemplated the original purpose of hunting and then neglected to reserve any water rights for that purpose. The State quotes the following language for this assertion: "water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Arizona I,* 373 U.S. at 599. While it does not appear that any water was set aside for hunting in *Arizona I*, the quoted language does not pertain to a discussion of the purposes of the tribe's reservation. Neither the opinion in *Arizona I* nor the record in that case suggests that any water rights claims for hunting were asserted; consequently, the Court was not presented with the question of whether water should be reserved for purposes other than agriculture. *See id.* at 598–600.

Instead, when taken in context, the language from *Arizona I* quoted by the State was included to refute the argument that Congress would have created a reservation without any water rights. *See Arizona I*, 373 U.S. at 598–99. The Court recognized that Congress undoubtedly intended the tribe to have the water rights at issue because

> [i]t is impossible to believe that when Congress created the . . . Reservation . . . [it was] unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised.

*Id.* This language quoted by the State was used to show that Congress knew the reservation to be arid, and thus intended to reserve "water necessary to sustain life[,]" not that it somehow contemplated hunting and fishing as reservation purposes and then decided to discontinue water rights for those purposes. *Id.* at 589.

The State also contends that *Winters* supports its argument that the later agreements should define the Reservation's purposes because the Court "looked solely to the purposes of [a]

16

new agreement," not to the purposes of the "earlier reservation." This argument is not supported by *Winters.*

The Court in *Winters* found that the applicable reservation was created by the May 1888 Act of Congress from the earlier, shared reservation. 207 U.S. at 575–76.[5] This shared reservation was somewhat limited in nature as the tribes merely had "the right to occupy and use" the land. *Id.* at 576; *see also* Act of Apr. 15, 1874, ch. 96, 18 Stat. 28. Moreover, it was shared by multiple tribes. 18 Stat. at 28. The shared reservation was eventually divided by the May 1, 1888, Act of Congress, which gave each tribe its own specific reservation. *See British-Am. Oil Producing Co. v. Bd. of Equalization of Mont.*, 299 U.S. 159, 162 (1936). Accordingly, *Winters* recognized that the applicable reservation was created in 1888 and analyzed it as such. *Winters*, 207 U.S. at 576. Thus, *Winters* is consistent with the standard set out above and stands for the proposition that implied water rights and their related purposes are determined when the reservation was created. *Id.* at 575–76.

The State further relies on *Winters* and *British-American* for the argument that later congressional action shrinking a reservation may act as a "change in condition" sufficient to supersede a previous executive order creating an Indian reservation. The State cites *British-American* for the proposition that executive orders may be "designed to be temporary," and, thus, subsequent congressional action may supersede them, leaving the orders without any force. 299 U.S. at 163. However, the State misconstrues the holdings in both *Winters* and *British-American*.

The State claims that the "change in condition" identified in *Winters*[6] was the subsequent congressional action "carving out a new smaller reservation . . . ." This is inaccurate. The "change of conditions" discussed in *Winters* concerns the tribe's need to alter the conditions of the land in order to make it farmable. *Winters*, 207 U.S. at 576. In context, the Court wrote:

> It was the policy of the government, it was the desire of the Indians, to change those habits and to become a pastoral and civilized people. If they should become such, the original tract was too extensive; *but a smaller tract would be inadequate without a change of conditions.* The lands were arid, and, *without irrigation*, were

---

[5] The Court wrote that "the agreement of May, [sic] 1888, result[ed]" in the creation of the reservation. It appears the Court meant to write "the Act of May 1, 1888," which ratified the relevant 1886 and 1887 agreements made with the tribes, and which created the reservation. *See* Act of May 1, 1888, ch. 213, 25 Stat. 113.

[6] The actual language from *Winters* is "change of conditions." 207 U.S. at 576.

17

practically valueless. And yet, it is contended, *the means of irrigation* were deliberately given up by the Indians[.]

*Id.* (italics added). The change of conditions, to which the Court refers, was an alteration of the arid condition of the land, i.e., through irrigation, which was necessary to make the reservation livable. *See id.* In no way is the Court referring to a change from the prior shared reservation to a new, re-established reservation. Thus, any attempt by the State to propose some sort of test to re-examine purposes based on a "change in condition" is unpersuasive.

Additionally, the State's reliance on *British-American* is unavailing. That case stated, "The Executive Orders before mentioned, evidently designed to be temporary, have been superseded by congressional action and no longer are of any force." *British-Am.*, 299 U.S. at 163. The Court was analyzing whether the reservation was created by executive order or statute because the relevant statute regarding taxes, not water rights, was dependent upon that distinction. *Id.* at 161–62. The Court did not inquire into when or how the reservation was created, let alone the purposes of the reservation. *See id.*

The Court did, however, outline the history of how the reservation was created. In doing so, the Court recognized that executive orders in 1873, 1874, 1875, and 1880, as well as congressional action in 1874, set out a larger "reservation" for the use of multiple tribes. *Id.* at 162. The Court in *British-American* then recognized that the individual reservations, specific to three of the Indian tribes, were created by a congressional act on May 1, 1888, out of the larger reservation. *British-Am.*, 299 U.S. at 162; Act of May 1, 1888, ch. 213, 25 Stat. 113. (The Court in *Winters* recognized the same. *Winters*, 207 U.S. at 567–68.)

In *British-American*, the Court found the executive order to be temporary but did not expound on how it arrived at that conclusion other than to list the subsequent, superseding 1888 and 1896 Acts of Congress. *British-Am.*, 299 U.S. at 162–63. The State has not provided an analysis regarding how the prior executive orders in *British-American* might be similar to the 1873 Executive Order in this case.

Instead, the language of the 1873 Executive Order in this case is similar to that found in the superseding congressional acts in *British-American*. Here, the 1873 Executive Order stated that the land described was "withdrawn from sale and set apart as a reservation for the" Tribe. Exec. Order of Nov. 8, 1873. Similarly, the superseding 1888 Act creating the individualized reservations referred to in *British-American* stated that the tribes would cede land "not herein

specifically set apart and reserved as separate reservations for them . . . ." 25 Stat. at 114. Thus, the two seem similarly permanent.

Additionally, the language in the later agreements (and 1891 Act) in this case does not suggest that they superseded the 1873 Executive Order. In the 1891 Act, the Tribe ceded land and agreed to a Reservation reduced in size from that created in 1873; however, its purposes were not reduced. Although the State offers some evidence that the 1873 Executive Order was "seen as a temporary measure to fully protect the [1873] agreement until the necessary legislation could be passed[,]" the later agreements do not supersede the Executive Order. Rather, the earlier of the two agreements refers to the Reservation as established in the 1873 Executive Order and proceeds in recognition of it. *See* Act of Mar. 3, 1891, ch. 543, § 19, 26 Stat. 989, 1027. The 1887 Agreement recognized the tribe was already "residing on the Coeur d'Alene Reservation, in the Territory of Idaho." Thus, it cannot be said that the later agreements and 1891 Act were intended to, or did in fact, negate or supersede the 1873 Executive Order. They did result in a substantial decrease in the size of the Reservation but did not affect the Reservation's purposes or the date of its creation.

*Winters*, *Arizona I*, and *British-American* do not address the narrower issue of deciding how a proposed purpose of a reservation is established—thus they are minimally instructive here. In conclusion, the State has not provided adequate law or reason to disregard the 1873 Executive Order when determining the Reservation's purposes and resultant water rights.

3. The later agreements do not clearly abrogate the Tribe's water rights or related tribal purposes.

The Tribe and United States contend that in order for Congress to limit the Tribe's rights it must explicitly do so, and the later agreements and 1891 Act fail to explicitly limit the purposes of the Reservation or rights of the Tribe. In response, the State largely reiterates its arguments outlined above. To the extent the State relies on a primary-secondary distinction, that distinction is inapplicable as will be discussed. For reasons explained below, Congress must clearly and plainly express its intent to abrogate tribal rights and it did not do so in the later agreements.

The law pertaining to Indian treaties also applies to tribal agreements that are ratified by Congress. "A treaty is viewed as 'a contract between two sovereign nations.' A treaty with an Indian Tribe constitutes a grant of rights *from* them, not a grant of rights from the United

19

States *to* the Indians." *City of Pocatello v. State*, 145 Idaho 497, 506, 180 P.3d 1048, 1057 (2008) (italics in original) (citing and quoting *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n* (hereafter *Fishing Vessel*), 443 U.S. 658, 675, 680, *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979)). Treaties must be ratified by Congress to become law. U.S. Const. art. II, § 2, cl. 2; *State v. Coffee*, 97 Idaho 905, 911–12, 556 P.2d 1185, 1191–92 (1976) (citing U.S. Const. art. VI, cl. 2).

The effect of treaties is the same as tribal agreements ratified by Congress. In the later agreements, the Tribe's members signed and consented to relinquishing all right, title, and claim to land outside the Reservation to the United States, thus demonstrating the grant of rights *from* the Tribe. The agreements were also ratified and set out verbatim in their entirety by Congress. §§ 19–20, 26 Stat. at 1027, 1029.

Moreover, the United States Supreme Court has treated agreements and treaties with Indians similarly for purposes of their interpretation:

> [T]reaties are construed more liberally than *private* agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. Especially is this true in interpreting treaties *and agreements* with the Indians; *they* are to be construed, so far as possible, in the sense in which the Indians understood them, and "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people."

*Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943) (italics added) (citations omitted); *see also Antoine v. Washington*, 420 U.S. 194, 199 (1975) ("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). Accordingly, tribal agreements that are ratified by Congress, such as the later agreements, are subject to the rules of treaty interpretation and construction.

The applicable standards and canons of construction for the later agreements are set out below.

> [T]he interpretation of . . . an Indian treaty, [and similarly a tribal agreement,] is a question of law for a court to decide. The examination of a treaty's negotiating history and purpose does not render its interpretation a matter of fact but merely serves as an aid to the legal determination which is at the heart of all treaty interpretation.

*City of Pocatello*, 145 Idaho at 505, 180 P.3d at 1056 (citations omitted).

20

"Congress will not abrogate Indian rights without clear intent and an express agreement from the Indians." *Id.* at 506, 180 P.3d at 1057; *United States v. Dion*, 476 U.S. 734, 738 (1986) ("We have required that Congress' intention to abrogate Indian treaty rights be clear and plain."). Indian rights are interpreted "in the sense the Indians themselves would have interpreted" or understood them. *City of Pocatello*, 145 Idaho at 506, 180 P.3d at 1057. Regarding this rule, the United States Supreme Court has stated,

> [T]he United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor.

*Fishing Vessel*, 443 U.S. at 675–76 (citations and quotation omitted). Thus, "Indian treaties [and ratified agreements] are to be interpreted liberally in favor of the Indians, and that any ambiguities are to be resolved in their favor[.]" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) (citations omitted). Similarly, "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *City of Pocatello*, 145 Idaho at 506, 180 P.3d at 1057 (quoting *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation* (hereafter *Yakima Indian Nation*), 502 U.S. 251, 269 (1992)); *Antoine*, 420 U.S. at 199 ("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). In addition, the United States Supreme Court has stated that "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians*, 318 U.S. at 432.

Here, Congress did not express a clear intent to abrogate any water rights or Reservation purposes in the later agreements. The State contends that the later agreements did not set out to revise the earlier agreement, but were a comprehensive replacement, thus establishing new, narrower purposes of agriculture and eliminating the purposes of hunting and fishing. The State also argues that the intent to abrogate fishing rights in the later agreements stems from Congress's omission of crucial language from the 1873 Agreement. That language in the 1873 Agreement stated: "the waters running into said reservation shall not be turned from their natural

channel where they enter said reservation." Contrary to this assertion, however, any hunting and fishing purposes were instead reaffirmed in the later agreements rather than limited.

This reaffirmation is evidenced by the following language found in the 1887 Agreement: "In consideration of the foregoing cession and agreements, it is agreed that the Coeur d'Alene Reservation shall be held forever as Indian land and as homes for the" Tribe. § 19, 26 Stat. at 1028. The Supreme Court has stated "the language 'to be held as Indian lands are held' includes the right to fish and to hunt." *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 (1968). As such, it does not appear that Congress intended to eliminate the Tribe's ability to hunt or fish or that it intended to limit the Tribe's water rights as they related to those two purposes of water use. (Also, even if the State were correct that the later agreements alone established the purposes of the Reservation, the language, "shall be held forever as Indian land" includes the purposes of hunting and fishing.) Instead, the rights abrogated by the Tribe were the cession of land and accompanying rights outside the Reservation by the 1887 Agreement, and the cession of land located in the established Reservation by the 1889 Agreement.

The later agreements and 1891 Act of Congress incorporated the original Reservation as created in 1873, and no rights or purposes have been clearly abrogated by subsequent acts. *See* § 19, 26 Stat. at 1027. Given that the later agreements refer to and ratify the original 1873 Reservation, there appears no reason to limit the examination to just the earlier Executive Order, as the later agreements (of 1887 and 1889) and the Congressional Act of 1891 also shed light on the intent of the parties. Therefore, the purposes of the Reservation may be derived from these documents, which illuminate the creation and later cession of portions of the Reservation.

**D.    The purposes of the Tribe's Reservation.**

1. The district court erred by applying the primary-secondary purpose distinction set out in *New Mexico*.

One of the central issues involved in all four appeals is whether the primary-secondary purpose analysis set out in *New Mexico* applies to Indian reservations or if it is limited to non-Indian reservations. The United States and the Tribe argue that *New Mexico* has no application to an Indian reservation. They maintain that because the reservation being considered in *New Mexico* was a national forest, it is distinguishable. The United States and the Tribe contend that the district court's reliance on the *New Mexico* primary-secondary purpose distinction was in error. The State argues that *New Mexico*'s primary-secondary analysis applies to Indian

22

reservations because it is derived from United States Supreme Court decisions addressing reservations, which included Indian reservations.

In *New Mexico*, the Supreme Court established the primary-secondary use analysis for determining whether a federally reserved water right would be implied within a United States National Forest. *New Mexico*, 438 U.S. at 701. The Court held, "Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended . . . that the United States would acquire water in the same manner as any other public or private appropriator." *Id.* at 702. Under the primary-secondary analysis, water is impliedly reserved for a reservation's primary purposes; it is not, however, reserved for its secondary purposes. *See id.* The United States Supreme Court has not explicitly decided whether *New Mexico*'s primary-secondary analysis applies to Indian reservations; as a result, different courts have treated *New Mexico*'s application to Indian reservations differently.

   a. *The reasoning set forth by the jurisdictions declining to apply New Mexico to Indian reservations is persuasive.*

Because *New Mexico* did not involve an Indian reservation, at least two state supreme courts have found *New Mexico*'s primary-secondary analysis inapplicable to Indian water rights cases. *See, e.g.*, *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source* (hereafter *Gila V*), 35 P.3d 68, 77 (Ariz. 2001); *State ex rel. Greely v. Confederated Salish & Kootenai Tribes of Flathead Reservation* (hereafter *Greely*), 712 P.2d 754, 767 (Mont. 1985). Other courts have found *New Mexico* to be applicable to and therefore binding precedent for Indian reservations. *United States v. Washington*, 375 F. Supp. 2d 1050, 1063–64 (W.D. Wash. 2005); *In re Gen. Adjudication of All Rights to Use Water in the Big Horn River Sys.* (hereafter *Big Horn I*), 753 P.2d 76, 96–97 (Wyo. 1988), *aff'd sub nom. Wyoming v. United States*, 492 U.S. 406 (1989) (affirmed by an equally divided court without opinion), *and abrogated on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo. 1998); *In re Gen. Adjudication of All Rights to Use Water in the Big Horn River Sys.* (hereafter *Big Horn III*), 835 P.2d 273, 278–79 (Wyo. 1992).

The Ninth Circuit has recognized that *New Mexico*'s primary-secondary analysis, despite not being "directly applicable" to Indian reservations, has several useful guidelines. *See, e.g., United States v. Adair*, 723 F.2d 1394, 1408 (9th Cir. 1983); *Agua Caliente,* 849 F.3d at 1269.

23

Despite this recognition, the Ninth Circuit has also generally applied *New Mexico* to Indian reservations. *See, e.g.*, *Agua Caliente*, 849 F.3d at 1269.

Wyoming, in *Big Horn I* (and later in *Big Horn III*), adopted the Ninth Circuit's application of *New Mexico*, despite noting that its applicability to Indian reservations had been brought into question. *Big Horn I*, 753 P.2d at 96. *Big Horn I* held that a reservation may have more than one primary purpose, which may include a homeland purpose, but determined the relevant reservation's treaty only encouraged agriculture; therefore, agriculture was the sole primary purpose of the reservation in that case. *Id.* at 97.

Although this Court has applied *New Mexico*, it has done so only with regard to non-Indian reservations. *See, e.g.*, *Potlatch Corp.*, 134 Idaho at 920, 12 P.3d at 1264. Also, this Court has recognized a distinction between Indian reservations and non-Indian reservations. *Id.* For example, in *Potlatch*, this Court emphasized that Indian reservations are created through a bargained-for exchange between two sovereign entities, while non-Indian reservations are not. *Id.*

As mentioned, at least two other state supreme courts, Montana's and Arizona's, have found *New Mexico* to be inapplicable to Indian reservations. *See generally Greely*, 712 P.2d at 767; *Gila V*, 35 P.3d at 77. The Supreme Court of Montana held that Indian and non-Indian reservations are to be distinguished from one another. *Greely*, 712 P.2d at 767. That court held that Indian reservations, and their reserved water rights, differ from other reservations and their reserved water rights in at least two important ways.[7] *Id.*

First, the two rights have different origins. *Id.* Non-Indian "[f]ederal reserved water rights are created by the document that reserves the land from the public domain. By contrast, aboriginal-Indian reserved water rights exist from time immemorial and are merely recognized by the document that reserves the Indian land." *Id.*

Second, Montana found ownership to be an important distinction. *Id.* "The United States is not the owner of Indian reserved rights; it is a trustee for the benefit of the" tribes. *Id.* In contrast, the United States owns federal reserved rights in all other reservations and has the

---

[7] Montana actually listed five differences: "origin, ownership, determination of priority date, the manner in which the purpose of the reservation is determined, and quantification standards." *Id.* at 766. Origin and ownership are particularly applicable here.

power to "lease, sell, quitclaim, release, encumber or convey its own federal reserved water rights." *Id.* Bearing these distinctions in mind, the Montana court held that Indian rights "are given broader interpretation in order to further the federal goal of Indian self-sufficiency." *Id.* at 768.

Similarly, the Supreme Court of Arizona held that Indian reservations should be distinguished from non-Indian reservations. *Gila V*, 35 P.3d at 77. *Gila V*, specifically disavowed Wyoming's application of the primary-secondary analysis in *Big Horn III*. *Id.* That court reasoned "[W]hile the purpose for which the federal government reserves other types of lands may be strictly construed, the purposes of Indian reservations are necessarily entitled to broader interpretation if the goal of Indian self-sufficiency is to be attained." *Id.* (quoting William C. Canby, Jr., *American Indian Law* 245–46 (1981)). While recognizing the same differences identified by the Supreme Court of Montana, Arizona identified others as well. *Gila V*, 35 P.3d at 74. One such difference is that, in the context of Indian reservations, the government, as trustee of such lands, must act for the Indians' benefit. *Id.* (citing *United States v. Mitchell*, 463 U.S. 206, 225–26 (1983)). "Thus, treaties, statutes, and executive orders are construed liberally in the Indians' favor." *Gila V*, 35 P.3d at 74 (citing *Yakima Indian Nation*, 502 U.S. at 269).

As mentioned, this Court has also previously noted a distinction between non-Indian reservations and Indian reservations. *Potlatch Corp.*, 134 Idaho at 920, 12 P.3d at 1264 ("*Winters* dealt with the creation of a reservation by treaty, a bargained for exchange between two entities. . . . To the contrary, the Wilderness Act is not an exchange; it is an act of Congress that sets aside land, immunizing it from further development. There is no principle of construction requiring the Court to interpret the Wilderness Act to create an implied water right. The opposite inference should apply."). Moreover, this Court has recognized that the "Indian canons of construction" are only to be applied "for the benefit of Indian tribes, not non-Indians." *City of Pocatello*, 145 Idaho at 505, 180 P.3d at 1056.

The reasons given by the Montana and Arizona courts are persuasive as to why the purposes of Indian reservations should not be construed similarly to non-Indian federal reservations. Even more to the point, the primary-secondary distinction runs counter to the concept that the purpose of many Indian reservations was to establish a "home and abiding place" for the tribes. *Winters*, 207 U.S. at 565. This leads to the consideration of a broader purpose that has been termed the homeland purpose theory, which is more consistent with both

25

Supreme Court precedent and the well-established canons of construction regarding Indian reservations. Notably, the Ninth Circuit appears to have endorsed a homeland purpose theory but still used the *New Mexico* primary-secondary distinction when analyzing reservation purposes. *See Agua Caliente*, 849 F.3d at 1269. Notwithstanding the somewhat contradictory Ninth Circuit precedent, we find the homeland purpose theory is better suited to an Indian reservation. We are unpersuaded *New Mexico* and its primary-secondary analysis should apply to Indian Reservations.

> b. *The homeland purpose theory gains support from precedent of the U.S. Supreme Court, other jurisdictions, and this Court.*

Language in *Winters* suggests a homeland purpose theory may arise in certain reservations. In *Winters*, the Supreme Court lent support to the idea that the reservation at issue was established as a "home and abiding place of the Indians." *Winters*, 207 U.S. at 565. Years later, the Supreme Court elaborated further that the implied reservation of water on Indian reservations requires enough water "to make the reservation livable." *Arizona I*, 373 U.S. at 599. Moreover, this Court, in interpreting *Winters* and *Arizona I*, wrote "the Supreme Court determined that the creation of the Reservations carried with it the need for water to sustain human life on those Reservations. The purpose for the creation of Reservations was clear—to provide habitable land for the Indian tribes." *Potlatch Corp.*, 134 Idaho at 920, 12 P.3d at 1264. Thus, in certain instances, Indian reservations were created to be a homeland for the tribe and such a homeland would necessarily encompass uses for water related to the tribe's ability to inhabit and live on the land.

On the surface, it might appear that *Winters* and *Arizona I* do not support a broad granting of water rights because both cases only established implied reserved water rights for agricultural purposes.[8] *Winters*, 207 U.S. at 576–77; *Arizona I*, 373 U.S. at 600–01. Importantly, however, these two cases did not involve general water rights adjudications (as is presented in these appeals) and the Court did not have the opportunity to address claims for water rights

---

[8] Although it appears to be generally understood that *Winters* only granted water rights for agricultural purposes (and the United States and the Tribe do not seem to argue otherwise), the opinion itself does not appear to clearly limit water rights to agricultural purposes. When determining implied water rights would be allowed, the Court, in posing a rhetorical question, suggested that the tribe did not give up water rights to "all . . . beneficial use, whether kept for hunting, 'and grazing roving herds of stock,' or turned to agriculture and the arts of civilization." *Winters*, 207 U.S. at 576. This articulation suggests a broader scope of purposes more aligned with the homeland purpose theory.

related to all purposes.[9] *See Big Horn I*, 753 P.2d at 96 (stating that *Winters* is "not authority for limiting reserved water for a permanent homeland reservation to irrigation because the only reserved water rights sought were for irrigation and related uses").

As mentioned, it appears that the Ninth Circuit has endorsed a broad homeland purpose theory as well, despite adding to the confusion by employing the primary-secondary language. *See Agua Caliente*, 849 F.3d at 1269. That court found the broad primary purpose of the Agua Caliente Reservation was "to create a home for the [t]ribe, and water was necessarily implicated in that purpose." *Id.* at 1270. The court further stated reserved water rights are "flexible and can change over time." *Id.* at 1272.

Arizona and Montana have also adopted the homeland purpose theory. The Arizona Supreme Court adopted the homeland purpose theory when it stated that it "agree[d] with the Supreme Court that the essential purpose of Indian reservations is to provide Native American people with a 'permanent home and abiding place,' that is, a 'livable environment.'" *Gila V*, 35 P.3d at 74 (internal citations omitted) (quoting *Winters*, 207 U.S. at 565; *Arizona I*, 373 U.S. at 599). The Arizona Supreme Court further relied on the Ninth Circuit's holding in *Walton I* when observing that this "broad" homeland purpose must be "liberally construed" to allow "tribes to achieve the twin goals of Indian self-determination and economic self-sufficiency." *Id.* at 76 (quoting *Walton I*, 647 F.2d at 47) (additional citations omitted).

In addition, the Supreme Court of Montana has recognized differences between the broad purposes of Indian reservations and the narrow purposes of non-Indian reserved water rights and wrote, "The purposes of Indian reserved rights, on the other hand, are given broader interpretation in order to further the federal goal of Indian self-sufficiency." *Greely*, 712 P.2d at 768 (citations omitted). The language used by the Supreme Court of Montana implies broad purposes similar to the homeland purpose theory.

---

[9] In an attempt to refute this proposition, the State cites the special master's report from *Arizona I* for the assertion that the Court was "asked to determine 'the full extent of the water rights created by the United States' for [the] Indian reservations." The State takes this language out of context. The "full extent" language did not suggest that the Court should examine and disallow purposes other than agriculture. Instead, this was a statement addressing the quantification stage of water for the agricultural purpose. The statement concludes that the practicably irrigable acreage standard was the appropriate way to measure the quantity of water, because it will preserve the "full extent" of the water rights for agricultural purposes. Further undermining the State's argument, that report also states, "Indeed, the United States asks only for enough water to satisfy future agricultural and related uses." Thus, water for purposes other than agriculture was not specifically addressed in *Arizona I*.

However, the Supreme Court of Wyoming took a different course and affirmed the lower court's rejection of the homeland purpose theory proposed by the special master,[10] and, in examining the treaty creating the reservation, determined agriculture to be the sole purpose of the reservation. *Big Horn I*, 753 P.2d at 96. The court in *Big Horn I* determined that the treaty language making the reservations the Indians' "permanent home" did "nothing more than permanently set aside lands for the Indians; it [did] not define the purpose of the reservation." *Id.* at 97. Instead, the court focused on the fact that the treaty "encouraged only agriculture," and referred to the reservation as "said agricultural reservations." *Id.* Thus, the Wyoming court determined agriculture was the primary purpose of the reservation, despite appearing to recognize that a homeland purpose could be established under the right circumstances. *See id.* Wyoming also relied on *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 117–18 (1938) to conclude that agriculture was the sole, primary purpose, despite "the fact that the Indians fully intended to continue to hunt and fish" on the reservation. *Id.* at 97–98.

However, Wyoming's reliance on *Shoshone Tribe of Indians* to limit the purposes of the reservation appears misplaced. Instead of limiting tribal rights in the reservation, the United States Supreme Court found that the tribe was entitled to compensation for timber and mineral rights in acreage sold, rights unrelated to agriculture. *Shoshone Tribe of Indians*, 304 U.S. at 118 ("[T]he right of the Shoshone Tribe included the timber and minerals within the reservation."). The Court further noted, "doubts, if there were any, as to ownership of lands, minerals, or timber would be resolved in favor of the tribe." *Id.* at 117. Thus, *Shoshone Tribe of Indians* instead appears to support a broader interpretation of Indian rights than given to it by the Wyoming Supreme Court.

There are two additional United States Supreme Court cases that suggest reservations may be created to further the economic endeavors of tribes, again supporting the conclusion that a broader homeland purpose theory should apply. *Alaska Pac. Fisheries Co. v. United States* (*Alaska Pacific*), 248 U.S. 78 (1918); *Fishing Vessel*, 443 U.S. at 686. In *Alaska Pacific*, when determining a tribe could enjoin others from fishing in reservation waters, the United States Supreme Court found that "'[t]he purpose of creating the reservation was to encourage, assist

---

[10] The special master concluded the reservation was created for the purpose of creating a "permanent homeland for the Indians," with water rights for the following purposes: "irrigation, stock watering, fisheries, wildlife and aesthetics, mineral and industrial, and domestic, commercial, and municipal uses . . . ." *Big Horn I*, 753 P.2d at 85.

and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life." 248 U.S. at 89. Similarly, the Court in *Fishing Vessel* wrote:

> As in *Arizona v. California* and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living.

443 U.S. at 686.

Given the substantive differences between Indian and non-Indian reservations, the broad interpretation of Indian reservation rights by the United States Supreme Court, the persuasive reasoning given by the Montana and Arizona courts, the logic supporting the homeland purpose theory, as well as our own precedent, we hold the district court erred in utilizing the primary-secondary analysis set out in *New Mexico*. Therefore, purposes behind the creation of an Indian reservation should be more broadly construed and not limited solely to what may be considered a "primary" purpose.

Further, the argument advanced by the State as to why *New Mexico* should apply to Indian reservations is unavailing. The State argues that because *New Mexico* was derived, in large part, from the United States Supreme Court's decisions addressing Indian reservations, there is no basis for concluding that the Court did not intend for *New Mexico* to apply to Indian reservations. However, the *New Mexico* Court's citations to *Winters* merely reflect a recognition that *Winters* was a seminal reserved water rights case, and reaffirms the requirement that claimed water is necessary to further the purposes of the reservation. *See New Mexico*, 438 U.S. at 700 n.4. We therefore reject this contention by the State and the Objectors' invitation to find that *New Mexico*'s primary-secondary distinction should be applied to Indian reservations.

2. The formative documents support application of the homeland purpose theory.

When analyzing the purposes of the Reservation, the district court determined that water rights could be implied for the following primary purposes: agriculture, hunting and fishing, and domestic. In doing so, the district court relied on the primary-secondary distinction established in *New Mexico* to reject secondary purposes as well as the homeland purpose theory.

The United States and the Tribe argue that the broader homeland purpose of the Reservation should be recognized by this Court. The United States contends that properly

recognizing the homeland purpose theory will allow water rights for the Tribe's continued traditional activities as well as for commercial and industrial development—claims denied by the district court. In contrast, the State argues that the implied-reservation-of-water doctrine should be applied narrowly. Accordingly, the State and the NIWRG argue that the homeland purpose theory should not be recognized. For the reasons explained below, we hold that the homeland purpose theory should apply to the Tribe's Reservation because it is evidenced by the formative documents.

   a. *Formative documents and historical circumstances should be used to derive the Reservation's purposes.*

When the Arizona Supreme Court recognized the homeland purpose theory, it also held that it would not derive purposes from historical documents and circumstances. *Gila V*, 35 P.3d at 74. The State argues that Arizona's departure from reliance on historical documents in *Gila V* is in error. *Gila V* announced the following reasons for its departure: Reservations are often "pieced together over time[,]" which may create an "arbitrary patchwork of water rights" stemming from different, derived purposes. 35 P.3d at 74. Such patchwork would be inconsistent with the homeland purpose. *Id.* The water rights are *implied*, not expressed, thus the historical reality is irrelevant. *Id.* at 75. Historical searches for purposes tend to focus on the motive of Congress, despite the rule that treaties are to be interpreted as the Indians would have understood them. *Id.* And, importantly, many formative "documents do not accurately represent the true reasons for which Indian reservations were created." *Id.*

We agree with the State that *Gila V* deviates from case law and the established interpretation framework regarding examination of formative documents to determine the purposes for an Indian reservation. Indeed, *Winters* itself suggests that the formative document must be analyzed. *See Winters*, 207 U.S. at 575 ("The case . . . turns on the agreement . . . resulting in the creation of [the] . . . Reservation."). The Ninth Circuit has stated that purposes are derived from "the document[s] and circumstances surrounding [a reservation's] creation, and the history of the Indians for whom it was created." *Agua Caliente*, 849 F.3d at 1270 (quoting *Walton I*, 647 F.2d at 42). This Court has also recognized that the formative document should be examined to determine purposes of a reservation. *See City of Pocatello*, 145 Idaho at 505–07 ("Tribes in this case impliedly received the water rights necessary to sustain the purposes of their reservation with the treaty establishing the Reservation.").

30

Moreover, the United States Supreme Court has stated that "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians*, 318 U.S. at 432. Years earlier, even after acknowledging the canons of construction favorable to tribes, the Court wrote:

> [T]his court does not possess any treaty-making power. That power belongs by the Constitution to another department of the government, and to alter, amend, or add to any treaty by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe, a treaty. . . . We are to find out the intention of the parties by just rules of interpretation applied to the subject-matter; and, having found that, our duty is to follow it as far as it goes and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind.

*United States v. Choctaw Nation*, 179 U.S. 494, 533 (1900) (quoting *Amiable Isabella*, 19 U.S. 1, 22 (1821)). As such, courts are constrained to use the formative documents and circumstances to determine the reservation's purposes. In sum, we agree with the State's argument that *Gila V* went too far in its rejection of the historical documents in determining the reservation's purposes. Treaties are not "living, breathing documents." They are not dynamic and should be viewed in a light consistent with that in which they were created. We are not authorized to rewrite them to undo perceived wrongs.

### b. The homeland purpose theory should be recognized when established by the formative documents.

The district court reasoned that utilization of the homeland purpose theory could be so expansive, that it would be "difficult to conceive a beneficial use of water that would not serve the expansive concept of 'the homeland.'" We share the district court's concerns; however, when viewed in the proper context, the homeland purpose theory is not without limits. The tenets of construction instead confine the homeland purpose theory to the parameters contemplated at the time surrounding the Reservation's creation and which are supported by the formative documents and circumstances. *See Arizona I*, 373 U.S. at 600 ("[T]he United States did reserve the water rights for the Indians effective as of the time the Indian Reservations were created."); *Agua Caliente*, 849 F.3d at 1270 (Purposes are derived from "the document[s] and circumstances surrounding [a reservation's] creation . . . ."). Moreover, the Supreme Court has announced that Indian reserved water rights are limited by the "necessity" requirement. *See New Mexico*, 438 U.S. at 700 (citing *Arizona I*, 373 U.S. at 600–01; *Winters*, 207 U.S. at 567).

As the United States Supreme Court has written:

> It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

*Tulee v. Washington*, 315 U.S. 681, 684–85 (1942) (citations omitted).

Given the law set out above demonstrating the United States Supreme Court's broad interpretation of Indian reservations, the multiple canons of construction favoring tribes, the concept that Congress intended to "deal fairly" with the Indians (*see Arizona I*, 373 U.S. at 600), and the nature of Indian reservations in general, it seems logical that a homeland purpose was contemplated and intended by Congress. Thus, the homeland purpose may be established when evidenced by the documents and circumstances creating a reservation.

3. The formative documents and historical context surrounding the Reservation's creation demonstrate a homeland purpose consisting of the following uses: domestic, agriculture, hunting and fishing, plant gathering, and cultural.

The formative documents and circumstances should be analyzed to determine the Reservation's purposes. Accordingly, all of the agreements, as well as the negotiations (including the Tribe's 1872 Petition), Executive Order of 1873, and the 1891 Act should be examined to ascertain the Reservation's purposes, as all are part of the formation of the Reservation and indicative of the parties' intentions.

In the negotiations leading up to the unratified 1873 Agreement, the Tribe's leaders stated, "We think it hard to leave at once old habits to embrace new ones: for a while yet we need [to] have some hunting and fishing." *United States v. Idaho*, 95 F. Supp. 2d 1094, 1103 (D. Idaho 1998) (quoting the Tribe's 1872 Petition), *aff'd Idaho II*, 533 U.S. at 262, 266. The unratified 1873 Agreement stated that "the waters running into said reservation shall not be turned from their natural channel where they enter said reservation." The 1873 Executive Order was brief and stated that the described land would be "withdrawn from sale and set apart as a reservation for the" Tribe. Exec. Order of Nov. 8, 1873.

The subsequently ratified 1887 Agreement introduced language demonstrating a homeland purpose. It reads: "[T]he Coeur d'Alene Reservation shall be held forever as Indian land and as homes for the Coeur d'Alene Indians, . . . and no part of said reservation shall ever be sold, occupied, open to white settlement, or otherwise disposed of without the consent of the Indians . . . ." § 19, 26 Stat. at 1028. The 1887 Agreement further stated that annual payments to

32

the Tribe "shall be expended in the purchase of such useful and necessary articles as shall best promote the progress, comfort, improvement, education, and civilization of" the Tribe. *Id.* That same article also provided for the construction of a saw and grist mill. *Id.*

The language above establishes the basis for a homeland that provides for the "progress, comfort, improvement, education, and civilization" of the Tribe, as well as aboriginal uses associated with "Indian land." *See Menominee Tribe of Indians*, 391 U.S. at 406. The language in the documents in this case differs in a number of critical ways from the treaty in *Big Horn I*.

*Big Horn I* rejected the homeland purpose theory for the following four reasons: (1) the language setting aside the reservation as a permanent home did not define purposes and instead merely set aside land; (2) the treaty only encouraged agriculture; (3) the treaty referred to the reservations as "agricultural reservations"; and (4) the court relied on *Shoshone Tribe of Indians,* 304 U.S. at 117–18, which noted the "purpose . . . [of the reservation was] to create an independent permanent farming community upon the reservation." *Big Horn I*, 753 P.2d at 96–98. These reasons are distinguishable from the facts in this case.

First, although the Executive Order may have merely set aside (or "set apart") land, the 1887 Agreement explicitly held the Reservation land "as Indian land and as homes . . . ." § 19, 26 Stat. at 1028. Lands of this nature are not merely "set aside," instead, they carry additional rights and meanings, as evidenced by the Supreme Court holding "the language 'to be held as Indian lands are held' includes the right to fish and to hunt." *Menominee Tribe of Indians*, 391 U.S. at 406. This type of language recognized the intent to establish a homeland and is the basis for the aboriginal uses (hunting, fishing, plant gathering, and cultural uses) claimed by the United States and the Tribe.

Second, the agreements do not solely encourage agriculture; they encourage "the progress, comfort, improvement, education, and civilization of" the Tribe.

Third, none of the documents refer to the Reservation merely as an "agricultural reservation." They clearly recognize the importance of agriculture; however, that is not the sole purpose.

Fourth, as already noted, the reliance by the Wyoming Supreme Court on *Shoshone Tribe of Indians* was flawed. Moreover, the Supreme Court's decision in *Idaho II*, while not binding as to the purposes of the Reservation, does not prescribe a limited agricultural purpose. Instead, *Idaho II* recognized that "the Tribe found the 1867 boundaries [of the proposed Reservation]

33

unsatisfactory, due in part to their failure to make adequate provision for fishing and other uses of important waterways." *Idaho II*, 533 U.S. at 266. *Idaho II* further stated that "[t]ribal members traditionally used the lake and its related waterways [some of which are now located in the Reservation] for food, fiber, transportation, recreation, and cultural activities." *Id.* at 265. This language suggests a purpose broader than a mere "agricultural reservation."

As such, the general purpose of the Reservation was to provide a homeland for the Tribe and that purpose "is a broad one and must be liberally construed." *Agua Caliente*, 849 F.3d at 1270 (quoting *Walton I*, 647 F.2d at 47). The homeland purpose may require water for multiple uses or included purposes. *Gila V*, 35 P.3d at 78. Given the analysis thus far and the language of the Reservation's formative documents, the following uses or included purposes will be recognized as involving water rights: consumptive uses for both domestic (including groundwater) and agriculture; and nonconsumptive uses for hunting (wildlife habitat), fishing (fish habitat), plant gathering (including seeps and springs), and cultural activities—so long as they can be established as aboriginal uses (i.e., uses of water predating the creation of the Reservation). *See Adair*, 723 F.2d at 1413.

> *a. The district court did not err in rejecting the Tribe's claim to control the water level of the Coeur d'Alene Lake.*

The district court denied the Tribe's claim to maintain the level of the Coeur d'Alene Lake (the Lake) at a certain elevation based on a lake level maintenance claim. This determination was correct given the formation of the Reservation. Although Congress may have intended for the Tribe to use the Lake for those purposes listed above (indeed, *Idaho II* listed numerous uses of the Lake), it is difficult to conclude that the inclusion of a minority fraction of the entire Lake[11] within the Reservation evidenced Congress's intent to establish the Tribe as the entity empowered to control the overall level of the Lake.

More importantly, as the Supreme Court noted in *Idaho II*,

---

[11] There seems to be some disagreement about what portion of the Lake falls within the Reservation. It is somewhere between 15.5% and 33% of the total Lake. According to David B. Shaw, P.E., the State's expert, the Lake's surface area within the Reservation in 1891 was about 15.5%. Mr. Shaw also calculated the surface area of the Lake within the Reservation at the time of his affidavit (October 2016) to be about 18%. In the district court, the United States argued this calculation was incorrect because *Idaho II* stated that approximately one-third of the Lake was within the Reservation. *See Idaho II*, 533 U.S. at 270. However, the State has argued that the one-third estimation is an approximation of the total *length* of the Lake north to south, while the 15.5% to 18% is the *surface area* of the Lake within the Reservation. It does not appear that the United States or the Tribe enlisted their own expert to refute Mr. Shaw's calculations.

> The Act [of Congress dated 1891] also directed the Secretary of the Interior to convey to one Frederick Post a "portion of [the] reservation," that the Tribe had purported to sell to Post in 1871. The property, located on the Spokane River and known as Post Falls, was described as "all three river channels and islands, with enough land on the north and south shores for water-power and improvements."

*Idaho II*, 533 U.S. at 271 (second alteration in original) (footnote and citation omitted).

In 1871, the Tribe conveyed the mouth of the Lake to Post for the purpose of harnessing "water-power." Having conveyed this property and the ability to harness the "water-power," the Tribe conveyed any interest it may have had in maintaining the Lake's level.[12] Therefore, the lake level maintenance claim was correctly denied by the district court, as the formative circumstances do not demonstrate that use was intended.

### b. The district court did not err in allowing groundwater claims.

The NIWRG argues that there is no binding authority allowing federal reserved groundwater claims. The NIWRG correctly notes that *Big Horn I* refused to grant reserved water rights to groundwater claims because no authority granting such a right was cited. However, *Big Horn I* simultaneously concluded that "[t]he logic which supports a reservation of surface water to fulfill the purpose of the reservation also supports reservation of groundwater." 753 P.2d at 99. After *Big Horn I* was decided, the Ninth Circuit expressly found that claims to groundwater could be established by federal reserved water rights. *Agua Caliente*, 849 F.3d at 1270.

*Agua Caliente* reasoned that the appurtenancy requirement in *Cappaert* merely required that the water be attached to the reservation, and thus did not limit the reserved water rights to surface water only. *Id.* at 1271 (citing *Cappaert*, 426 U.S. at 138). *Agua Caliente* further noted that the Supreme Court in *Cappaert* also suggested that reserved water rights may include groundwater because a proper reserved water right may enjoin other users from diverting groundwater; thus, "[i]f the United States can protect against groundwater diversions, it follows that the government can protect the groundwater itself." *Id.* (footnote omitted) (citing *Cappaert*, 426 U.S. at 143). Finally, the Ninth Circuit has stated that "the fact that the Tribe did not historically access groundwater does not destroy its right to groundwater now." *Id.* at 1272 (citing *Walton I*, 647 F.2d at 51). The Arizona Supreme Court has allowed reserved rights to

---

[12] Under common law and various Nonintercourse Acts, title to Indian land cannot be conveyed without federal consent. *See generally, e.g.*, *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 667–681 (1974). However, because the conveyance to Post was included in the 1891 Act of Congress, both the federal government and the Tribe agreed to the sale. *See* § 22, 26 Stat. at 1031–32.

35

groundwater, however, only where other surface water was insufficient: "A reserved right to groundwater [Indian or otherwise] may only be found where other waters are inadequate to accomplish the purpose of a reservation." *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source* (hereafter *Gila III*), 989 P.2d 739, 748 (Ariz. 1999).

The NIWRG's reliance on *Big Horn I*, in which the court admitted that logic supports the implied reservation of groundwater, does not undermine *Agua Caliente*. Thus, the district court did not err in allowing domestic use groundwater claims.

### c. *The district court correctly denied industrial, commercial, and aesthetic uses.*

The homeland purpose in this case does not encompass industrial or commercial uses. Two Supreme Court cases, *Alaska Pacific*, 248 U.S. at 89 and *Fishing Vessel*, 443 U.S. at 686, have been cited to suggest that some reservations are created to further the economic or commercial endeavors of tribes. Although these two cases demonstrate that industrial purposes may be applicable in some cases, they cannot be used to insert unintended purposes when not evidenced by the formative documents.

The language in the 1887 Agreement provided for a saw and grist mill and for expenditures to "promote the progress, comfort, improvement, education, and civilization of" the Tribe. In support of establishing commercial uses, the United States also points to language found in the Tribe's 1885 Petition. The Petition states, "Our people now need grist and saw mills, proper farming implements, and mechanics to help to teach us and our children proper industrial pursuits, and the use of tools in connection therewith . . . ." Generally, the Objectors argue that this language and the language in the actual agreements, supports the more limited idea that only agricultural endeavors were intended.

Although tribal agreements must be construed as the Tribe would have understood them, given the focus on agriculture[13] and its importance *at that time*, it appears that both the Tribe and Congress understood the agreements as establishing uses for agricultural endeavors, not every conceivable commercial or industrial venture. The appropriate purposes and uses are confined to those contemplated at the time surrounding the creation of the Reservation. *See Arizona I*, 373 U.S. at 600; *Agua Caliente*, 849 F.3d at 1270.

---

[13] The unratified 1873 Agreement requested wagons, harnesses, plows, horses, saws, and other *agricultural* implements.

The State cites to *Big Horn I*, 753 P.2d at 95, *Adair*, 723 F.2d at 1410, and *Department of Ecology v. Yakima Reservation Irrigation District*, 850 P.2d 1306, 1310 (Wash. 1993) for the proposition that agreements providing for mills do not independently establish intent for commercial uses. That is the case here. There is scant evidence suggesting broader industrial uses should be allowed. If this Court were to imply water for commercial or industrial uses, it would impermissibly write a provision into the tribal agreements. *See Choctaw Nation*, 179 U.S. at 533. Likewise, there is no evidence in the agreement that aesthetic purposes were contemplated. Therefore, the district court did not err in disallowing water rights for industrial, commercial, and aesthetic purposes.

E.    **The NIWRG's proposed application of the necessity test is inapplicable at this juncture.**

As mentioned, the district court bifurcated the proceedings below into an entitlement phase and a quantification phase. The NIWRG advances a "test of necessity" that would deprive the Tribe of any reserved water rights at this juncture. As established below, there are two components to the necessity test, one applicable at each phase. However, the NIWRG requests that this Court apply the necessity requirement applicable to the quantification phase to the entitlement phase. We decline to do so.

Although we have concluded the primary-secondary analysis from *New Mexico* does not apply, that opinion outlined the necessity test, including its application to Indian reservations. 438 U.S. at 700. Citing to both *Arizona I* and *Winters*, the United States Supreme Court wrote:

> [T]he Court has repeatedly emphasized that Congress reserved "only that amount of water *necessary* to fulfill the purpose of the reservation, no more." *Cappaert, supra*, at 141, 96 S. Ct., at 2071. *See Arizona v. California, supra*, at 600-601, 83 S. Ct., at 1497-1498; *District Court for Eagle County, supra*, at 523, 91 S. Ct., at 1001. Each time this Court has applied the "implied-reservation-of-water doctrine," it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated.

*Id.* (italics added) (footnote citing *Winters* omitted). Thus, there is a necessity test at each phase: in the quantification phase, the amount of water reserved can be no more than needed "to fulfill the purpose of the reservation[;]" while in the entitlement phase, an implied right to water can only be established if that purpose would be "entirely defeated" without the claimed water right. *See id.*

The Ninth Circuit has shed some light on the test of necessity regarding entitlement: "[T]he question is whether the purpose underlying the reservation envisions water use[;] . . . . a reserved right exists if the purposes underlying a reservation envision access to water." *Agua Caliente*, 849 F.3d at 1269–70. The test "does not ask if water is currently needed to sustain the reservation; it asks whether water was envisioned as necessary for the reservation's purpose at the time the reservation was created." *Id.* at 1272. Similarly, the Court in *Walton I* held that "subsequent acts making the historically intended use of the water unnecessary do not divest the Tribe of the right to the water." *Walton I*, 647 F.2d at 48. Based on *Walton I*, *Agua Caliente* held that later "state water entitlements do not affect our analysis with respect to the creation of the Tribe's federally reserved water right." *Agua Caliente*, 849 F.3d at 1272.

The NIWRG contends that state "regulation of fish and wildlife negates" the need for a federal reserved water right to enable fishing. The NIWRG advances this same argument for the preservation of lake levels, agriculture, and groundwater claims—that the water is protected or preserved by later state law. All of these arguments fail for the same reason.

As precedent demonstrates, all the entitlement phase necessity test dictates is that the purpose itself requires water from the onset. *Agua Caliente*, 849 F.3d at 1270–72 (The test "does not ask if water is currently needed to sustain the reservation[.]"). Any later regulations or statutes do not affect the entitlement to the reserved water right. *Id.* at 1272; *Cappaert*, 426 U.S. at 138 ("The United States acquires a reserved right in unappropriated water which vests on the date of the reservation [.]"). Thus, the NIWRG's necessity arguments fail. *Agua Caliente*, 849 F.3d at 1272.

**F.    The district court correctly concluded the Tribe's water rights include instream flows on the Reservation.**

The United States claimed nonconsumptive water rights for the Tribe both within and outside of the Reservation boundaries to maintain the Tribe's fishery.[14] Those claimed rights inside the Reservation include claims on both tribal and non-tribal-owned lands. For clarity, it is best to understand this dispute as involving three concentric circles. The innermost circle involves claimed water rights on Reservation property owned by the Tribe or members of the

---

[14] Fishery, as used by the parties, refers to a place for catching fish; not a commercial establishment for rearing fish.

Tribe. Claims within this first circle are not at issue in these appeals.[15] The middle circle includes claimed water rights to the instream flows within the Reservation, but on lands that neither the Tribe nor members of the Tribe own. These were allowed by the district court and that decision has been appealed by the State. The outermost circle involves claims for instream flows on non-tribal-owned land off of the Reservation. The United States and the Tribe claim an entitlement to these off-Reservation instream flows to enhance stream habitat and fish stocks to satisfy their on-Reservation fishing purpose. These outermost claims were rejected by the district court and that decision has been appealed by the United States and the Tribe.

In their appeals, the United States and the Tribe argue that instream water flows, regardless of which category they might fall within, are necessary to fulfill the purpose of fishing on the Reservation. In addition, the United States and the Tribe argue that the district court incorrectly applied the "appurtenancy" requirement.[16]

In response to the appeals brought by the United States and the Tribe, the State argues that water rights are only reserved by implication when the water is within or bordering the Reservation and that the Tribe ceded all right, title, and claim to land and water outside of the Reservation in 1891. The NIWRG and Hecla join the State in its argument. In addition, the State argues that the district court erred in allowing water rights for instream flows on reacquired Reservation land, regardless of whether they were originally owned by the Tribe. The State contends that when the land was either opened to the public (for homesteading) or sold by an Indian allottee, the rights to water on those lands were extinguished.

In response, the United States and the Tribe argue that the instream-flow rights in all three concentric circles are necessary for the biological strength and diversity of adfluvial fish[17] species that they fish on tribal-owned lands. Both the United States and the Tribe argue that the

---

[15] The State only challenges these rights on the basis that the Tribe is not entitled to any water rights for fishing, as it contends fishing was not a primary purpose of the Reservation. However, contingent upon this Court granting water rights for fishing, the State does not contest that the Tribe would then have rights to instream flows on land owned by tribal members for that established purpose.

[16] Federal reserved water rights are limited to unappropriated water that is "appurtenant" to the Reservation. *Cappaert*, 426 U.S. at 138. As discussed *infra*, the meaning of "appurtenancy" is contested and while it does not require physical adjacency, it has been held to limit "reserved right to those waters which are *attached* to the reservation." *Agua Caliente*, 849 F.3d at 1271 (italics added).

[17] Adfluvial fish migrate upstream, and in some cases downstream, to spawn. Juvenile fish mature either upstream or downstream but migrate to lakes to feed as adults. The word "adfluvial" appears etymologically of recent origin. Dictionaries, even those online, do not contain the word in their compendiums or databases. The word appears to have first made its appearance in scientific journals in the 1990s.

right to maintain these waters is for use on tribal-owned lands, not the right to fish on or to regulate non-tribal lands. In addition, the Tribe argues that the instream water flow rights have never been abrogated by actions of Congress.

These instream-flow claims are for nonconsumptive water rights. Nonconsumptive water rights allow a senior water right holder to prevent others from appropriating water; it is not a right to appropriate or deplete a particular body of water. *Cappaert*, 426 U.S. at 135, 143; *Adair*, 723 F.2d at 1411 (explaining that a water right for instream flows prevents "appropriators from depleting the streams['] waters below a protected level in any area where the non-consumptive right applies").

While the issue of whether reserved water rights includes protection of upstream fish habitat[18] has not been resolved by the U.S. Supreme Court, some federal circuit and district courts seem at least willing to reach that conclusion. First, in *Walton I*, the Ninth Circuit considered whether the tribe held a flow-maintenance right in a stream that flowed across both Indian and non-Indian-owned allotments. *Walton I*, 647 F.2d at 48. The court found a reserved water "right to sufficient water to permit natural spawning of the trout[,]" because "preservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation." *Id.* In determining what constituted "sufficient water," the Ninth Circuit relied on the fact that the fish needed freshwater to spawn. *Id.* at 45.

Similarly, the U.S. district court in *United States v. Anderson*, 591 F. Supp. 1, 5 (E.D. Wash. 1982), *rev'd in part on other grounds,* 736 F.2d 1358 (9th Cir. 1984), found a right to instream flows. After finding that fishing was one of the purposes of the reservation, the district court found that the tribe had a "reserved right to sufficient water to preserve fishing" and the quantity of water sufficient to maintain a certain water temperature to meet the biological needs of fish. *Id.*

Although it did not involve a reserved water rights case, the Ninth Circuit allowed protection for stream flows that provided salmon spawning habitat. *Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032, 1033–35 (9th Cir. 1985). The Ninth Circuit

---

[18] The United States and the Tribe only claim water rights to upstream fish habitat. However, adfluvial fish may also spawn downstream.

recognized a necessity for upstream habitats, even though the flows at issue were over fifty miles away. *Id.*

Here, the Tribe's expert, Dr. Dudley Reiser, has opined that upstream habitat is necessary for the health of Lake Coeur d'Alene's adfluvial fisheries. The instream flows claimed, both on and off the Reservation, are tied to the Tribe's fishing on tribal-owned lands on the Reservation. The fish species that the Tribe has historically fished, the Westslope Cutthroat Trout and Bull Trout, are adfluvial species. These species spend a significant part of their lives in Lake Coeur d'Alene, but spawn by migrating upstream and downstream in rivers and streams located both on and off the Reservation. These spawning areas are quite expansive within the Coeur d'Alene Basin. Fish can travel more than a hundred miles in search of spawning grounds.

The federal reserved water rights doctrine, as recognized in *Winters*, allows the United States to reserve waters "appurtenant" to federally reserved lands in order to fulfill the purposes of the reservation. *Cappaert*, 426 U.S. at 138 (the government "reserves *appurtenant water* then unappropriated to the extent needed to accomplish the purpose of the reservation." (italics added)). However, the United States Supreme Court has never defined "appurtenant" in regards to a reserved water right.

Generally, "appurtenant" does not mean physical adjacency. *See John v. United States*, 720 F.3d 1214, 1229 (9th Cir. 2013). Rather, "[a]ppurtenancy has to do with the relationship between reserved federal land and the use of the water, not the location of the water." *Id.* at 1230 (alteration in original). This Court recognized that appurtenance is not dependent upon a "physical relationship" with the land. *See Joyce Livestock Co. v. United States*, 144 Idaho 1, 12, 156 P.3d 502, 514 (2007).

Further, there has been some recognition by the United States Supreme Court in granting reserved water rights in water that were not directly located on tribal-owned land. For example, in *Arizona II*, the Court found the Cocopah Reservation was entitled to a water right in the Colorado River, which was near to, but not abutting the reservation boundary. *Arizona II*, 376 U.S. at 344–45.[19]

_____

[19] The State argues it was established that the reservation was located along the Colorado River in that case, thus suggesting a requirement of physical adjacency. While that was eventually found to be the case, at the time *Arizona I* was decided in 1963, the United States had determined in a published Department of Interior Solicitor's Opinion that the Cocopah Reservation was only near, not abutting the Colorado River. It was not until 1972, well after the

41

The State argues that instream-flow claims within the Reservation on land unowned by the Tribe and claims off of the Reservation should be disallowed. Accordingly, the State posits two different ways by which the water rights were extinguished. For on-Reservation claims, the State argues the Indian Appropriations Act extinguished all tribal water rights. For off-Reservation claims, the State contends that the later agreements extinguished all water rights of the Tribe.

    1.   <u>The district court properly allowed claims for instream flows on-Reservation.</u>

The State argues that the district court erred by allowing water rights claims for instream flows on land that is on the reservation but is no longer owned by the Tribe because those rights were alienated through subsequent congressional acts. Given the canons regarding interpretation of Indian treaties and congressional acts, we do not find the State's arguments persuasive.

Reservations are established by a grant of rights from the tribe, not a grant of rights to the tribe. *United States v. Winans*, 198 U.S. 371, 381 (1905). Further, as noted, "Congress will not abrogate Indian rights without clear intent and an express agreement from the Indians." *City of Pocatello*, 145 Idaho at 506, 180 P.3d at 1057 (citations omitted); *Dion*, 476 U.S. at 738 ("We have required that Congress' intention to abrogate Indian treaty rights be clear and plain."). Indian rights are interpreted "in the sense the Indians themselves would have interpreted" or understood them. *City of Pocatello*, 145 Idaho at 506, 180 P.3d at 1057. Thus, any extinguishment of the Tribe's water rights "is not to be lightly imputed to the Congress," and requires a clear expression of congressional intent. *Dion*, 476 U.S. at 739.

Here, there is no clear or express action by Congress abrogating the Tribe's water rights to instream flows for on-Reservation claims. The language and legislative history of the Indian Appropriations Act say nothing about the Tribe's water rights. 1906 Indian Appropriations Act, ch. 3504, 34 Stat. 325, 335–36. The Indian Appropriations Act provided that each Indian on the Reservation would receive an allotment of 160 acres. 34 Stat. at 335. The Act provided that lands remaining after allotment would be classified, appraised, and "opened to settlement and entry" by non-Indian homesteaders. 34 Stat. at 336. Any surplus lands, that were not sold, remained in trust for the beneficial interest of the Tribe. However, there is no mention of water rights in the

<hr>

*Arizona II* decision, that the United States reversed its position and published a Solicitor's Opinion finding that the Cocopah Reservation "extended to the Colorado River."

Act. *See* 34 Stat. at 335–36. Thus, the Tribe's water rights for instream flows located on the Reservation remain, on both tribal-owned lands and non-tribal owned lands, because there was no clear abrogation by Congress. Accordingly, we affirm the district court's order allowing these rights.

2. <u>The district court properly disallowed claims for instream flows off of the Reservation.</u>

The Objectors argue that the Tribe ceded a significant portion of its Reservation by entering into the 1889 Agreement, and in so doing returned those lands to the public domain, demonstrating federal policy to prioritize mineral development (as Hecla argues), or homesteading and private appropriation (as the State argues). The district court agreed and granted summary judgment to the State and the Objectors with regard to instream flows off of the Reservation. The Tribe and the United States have appealed, contending the district court erred in failing to apply relevant federal law.

This Court recognizes that it "must interpret these treaties differently than ordinary conveyances, keeping in mind the probable understanding of the Indians." *State v. Tinno*, 94 Idaho 759, 763, 497 P.2d 1386, 1390 (1972) (internal citations omitted). And, the Tribe's water rights cannot be abrogated without a clear statement of congressional purpose. *City of Pocatello*, 145 Idaho at 506–07.

Although appurtenancy does not require that ownership of a water right be connected to the ownership of the land through which that water runs, the Tribe clearly ceded any right to water off of the Reservation. For this reason, the Objectors are correct that the cession of land through the 1889 Agreement abrogated the right to any water off of the Reservation, even if the current science suggests the water eventually fulfills a purpose on tribal-owned land.

This is not a situation where there is ambiguity. The Tribe, by entering into the agreement with the United States, agreed to "cede, grant, relinquish, and quitclaim to the United States *all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere,* except the portion of land within the boundaries of their present reservation" in exchange for cash and other considerations. 26 Stat. at 1027 (italics added). Having explicitly relinquished its "right, title, and claim" to lands outside of the Reservation, this constituted a voluntary relinquishment of any claim to off-Reservation water rights, even those that would now arguably benefit an on-Reservation purpose. Bolstering this conclusion is the expansive

43

language in the agreement, by which the Tribe relinquished all right, title, and claim *which they now have, or ever had, . . . .*" *Id.* By this language the Tribe ceded everything it had or ever had as it relates to off-Reservation instream flows. The district court did not err in rejecting the claims of the Tribe and the United States to instream flows off-Reservation.

The dissent takes issue with this conclusion because it does not believe that the Coeur d'Alene tribal members clearly abrogated their water rights when they relinquished "all right, title, and claim which they now have, or ever had, to *all lands* in said Territories . . . ." In order to clarify that "water" was part of what the United States meant by the use of the word "lands," one need look no further than Judge Lodge's decision and his recapitulation of the formative documents contained in *United States v. Idaho*, 95 F. Supp. 2d 1094, 1103 (D. Idaho 1998).

> In an apparent effort to *clarify the status of the Lake and rivers*, the Senate, on January 25, 1888, passed a resolution which repeated the allegations made by Colonel Carlin and others, and requested a response from the Secretary of Interior:
>
>> Whereas it is alleged that the present area of the Coeur d'Alene Indian reservation, in the Territory of Idaho, embraces 480,000 acres of land . . . [and] that Lake Coeur d'Alene, *all the navigable waters of Coeur d'Alene River*, and about 20 miles of the navigable part of St. Joseph River, and part of St. Mary's, a navigable tributary of the Saint Joseph, are embraced within this reservation, except a shore-line of about 3½ miles at the north end of the lake . . . that all boats now entering such waters are subject to the laws governing Indian country and all persons going on such lake or waters within the reservation lines are trespassers; and
>>
>> Whereas it is further alleged that the Indians now on such reservation are located in the extreme southwest corner of the same . . . and it being further alleged that all part of such reservation lying between Lake Coeur d'Alene and Coeur d'Alene River and that part between the Coeur d'Alene River and St. Joseph River is a territory rich in the precious metals and at the same time being of no real use or benefit to the Indians: Therefore,
>>
>> *Resolved,* That the Secretary of the Interior be, and he is hereby directed to inform the Senate as to the extent of the present area and boundaries of the Coeur d'Alene Indian Reservation . . . *whether such area includes any portion, and if so, about how much of the navigable waters of Lake Coeur d'Alene and of Coeur d'Alene and St. Joseph Rivers* . . . also whether, in the opinion of the Secretary, it is advisable to throw any portion of such reservation open to occupation and settlement under mineral laws of the United States, and if so, precisely what portion; *and*

44

*also whether it is advisable to release any of the navigable waters aforesaid from the limit of such reservation.*

Ex. 187 at 693.

Responding on behalf of the Secretary of the Interior, the Commissioner of Indian Affairs, on February 7, 1888, reported to the Senate that *"the reservation appears to embrace all the navigable waters of Lake Coeur d'Alene*, except a very small fragment cut off by the north boundary of the reservation which runs 'in a direct line' from the Coeur d'Alene Mission to the head of Spokane River." *Ex.* 213 at 3. After describing the "proportion of the reservation" suitable for agriculture, grazing and mining, the Commissioner reiterated the question posed by the Senate resolution: *whether it would be "advisable to throw any portion of the said reservation open to the occupation and settlement . . . and, if so, precisely what portion, and whether it is desirable to release any of the navigable waters." Id.* at 3–4. *Based on his opinion "that the reservation might be materially diminished without detriment to the Indians," the Commissioner recommended "that changes could be made in the boundaries for the release of some or all of the navigable waters therefrom, which would be of great benefit to the public." Id.* at 6. *Although the Commissioner was "unable to say . . . [j]ust what portion of the reservation and navigable waters should be segregated from the reservation," he thought it could "be determined by negotiations with the Indians." Id. The Commissioner concluded his report by opining that after ratification of the 1887 agreement "it will be an easy matter to negotiate with [the Tribe] for the cession of such portions of their reservation as they do not need, including all or a portion of the navigable waters, upon fair and very reasonable terms." Id. The Commissioner attached to his report a map of the 1873 reservation which depicted the Lake and rivers in relation to the reservation's boundaries and which displayed the total area of the reservation at 598,499.85 acres.*

It was against this backdrop that Congress in 1888 debated the merits of the 1887 agreement. A 1890 House Report explained that the Fiftieth Congress (1888 session) decided against ratifying the 1887 agreement

> for sundry reasons, among which was a desire on the part of the United States to acquire an additional area, to wit, a certain valuable portion of the reservation specially dedicated to the exclusive use of said Indians under an Executive order of 1873, and which portions of said lands, situate on the northern end of said reservation, is valuable and necessary to the citizens of the United States for sundry reasons. It contains numerous, extensive, and valuable mineral ledges. It contains large bodies of valuable timber . . . . *It contains a magnificent sheet of water, the Coeur d'Alene Lake, and its chief tributary, to wit, the Coeur d'Alene River . . . .*

Ex. 206 at 4.

45

While withholding its approval of the 1887 agreement, Congress took steps "to acquire . . . the northern end of [the 1873] reservation." *Id.* On March 2, 1989, Congress passed the annual Indian Appropriations Act, which included a provision that authorized the Secretary of the Interior "to negotiate with the Coeur d'Alene tribe of Indians for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell." Ex. 2288 at 1002.

In August and September of 1889, a three member Commission met with tribal leaders and negotiated for the release of the reservation's northern end. The minutes of the negotiations reveal that the location of *the new boundaries in relation to the Lake and rivers was a matter of concern to both the Tribe and United States.* Known for their sagacity, and aware of the Federal Government's tendency to disregard its commitments to the Indian tribes, the Coeur d'Alenes insisted on defining the terms of any new agreement with precision. At one point during the negotiations, General Simpson, the government's chief spokesman, told tribal leader Chief Seltice that "the Lake belongs to you as well as to the whites—to all, every one who wants to travel on it." Ex. 215 at 9. Seltice replied: "That is your idea about the boundary. You know we do not understand papers; in taking it that way we will not know the boundaries." *Id. General Simpson then offered the United States' proposal for a diminished reservation and prefaced his description of its boundaries by stating: "You all know where the St. Joseph River is. We do not want any of that." Id.* The government's proposal called for a new northern boundary that ran east from the Idaho/Washington territorial line to the west shore of the Lake, meandered the lake shore south to a point directly opposite the mouth of the Coeur d'Alene River, and "thence due east across said lake." *Id.* Thus, the boundary line was drawn so as to bisect the Lake, with the northern two-thirds of Lake excluded from the reservation and the southern one-third of the Lake included within the new reservation boundaries. *See id.* at 14, attach.(map). General Simpson explained to the Tribe that under the government's proposal "*if we buy this land [the northern end of the 1873 reservation] you still have the St. Joseph River and the lower part of the lake and all the meadow and agricultural land along the St. Joseph River.*" *Id.* at 9. With some modification, this proposal became the basis of an agreement signed on September 9, 1889. The agreement provided that it was "not binding on either party until ratified by Congress." *Id.* at 14.

In a 1889/90 Report of the Secretary of the Interior to the House of Representatives, the 1889 agreement is *described as an agreement "whereby the Indians agreed to sell a considerable portion of their reservation (in the northern part), valuable chiefly for minerals and timber, and embracing by far the greater portion of the navigable waters of the reservation.*" Ex. 250 at 22; *see also* Ex. 206 at 4.

*Idaho*, 95 F. Supp. 2d 1094, 1111–13 (D. Idaho 1998) (italics added) (footnotes omitted).

The treaty negotiations clearly and repetitively referred to "waters" outside the reservation as being part of what the United States sought to purchase from the Tribe. While the

treaty speaks in terms of the Coeur d'Alene tribal members relinquishing all "right, title, and claim which they now have, or ever had, to all lands[,]" the agreement included language, which at the time would have conveyed fee simple absolute title to "all lands." In other words, it conveyed everything the Tribe possessed, including the water.

The language "if we buy this land [the northern end of the 1873 reservation] you still have the St. Joseph River and the lower part of the lake and all the meadow and agricultural land along the St. Joseph River" indicates that the other rivers and water that are part of the ceded lands would likewise be ceded. *Idaho*, 95 F. Supp. 2d 1094, 1113 (alteration in original). To conclude otherwise would result in the Treaty being rewritten, which the canons of construction prohibit.

A fair reading of the history regarding the negotiation contained in Judge Lodge's decision leads to the inescapable conclusion that the United States, in negotiating with the Tribe, contemplated the reacquisition of everything contained on the land, including water. The dissent finds the lack of the words "*and water*" sufficient to parse the conveyance in ways that are too meticulous. In focusing on the generic definitions of "lands," the dissent fails to recognize what the historical documents in this case reveal. In the 1890s, the Tribe's relinquishment "of all right, title, and claim" which it now has "or ever had, to all lands in said Territories" included water. This interpretation is amply supported by the historical documents surrounding the treaty.

The dissent also relies on *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 195 (1999) for the proposition that the United States Supreme Court rejected a similar argument recognized in this section. However, *Mille Lacs* is not instructive on the issue presented. First, *Mille Lacs* involved usufructuary hunting and fishing rights. *Id.* at 195. A usufruct is "[a] right for a certain period to use and enjoy the fruits of *another's* property without damaging or diminishing it[.]" *Black's Law Dictionary* (11th ed. 2019) (italics added). Here, all involved agree that the instream flow rights at issue are not usufructuary rights. The United States concedes in its briefing that "the United States and Tribe are not claiming a right of the Tribe to physically access these upstream waters for fishing. Instead, the 'off-Reservation' instream flow claims are meant solely to support the Tribe's on-Reservation fishery." The dissent acknowledges that *Mille Lacs* concerned different rights than those at issue here. On a similar note, *Mille Lacs* did not deal with the question presented in this case. *Mille Lacs* only dealt with whether the tribe had relinquished usufructuary rights. The case did not involve any water law

47

rights. Given the complex nature of water rights, cases that involve a distinguishable right have little instructive value. Therefore, the dissent's reliance on the *Mille Lacs* case is inappropriate.

In addition, the dissent relies on *Adair* for reasons similar to its reliance on *Mille Lacs*. However, the facts in *Adair* also differ significantly from the facts in this case. *Adair* concerned the issue of whether when the tribe ceded a portion of its aboriginal land to the United States, whether it also ceded the water rights contained on the land it reserved for the tribe. *Adair*, 723 F.2d at 1414. The dissent quotes from *Adair*: "Nor is it possible that the Tribe would have understood such a reservation of land to include a relinquishment of its right to use the water as it had always used it on the land it had reserved as a permanent home." *Id.* A fair reading of *Adair* supports this Court's majority conclusion: when the tribe in *Adair* reserved certain lands for itself, it also retained the water rights associated with those lands. *Id.* Therefore, the use of lands or a description of particular lands, also includes the water rights associated with those lands. In this regard, *Adair* supports the majority decision in that the Tribe is recognized as controlling instream flows on the Reservation.

*Adair* did not answer the specific question presented to this Court: is there a right to off-Reservation instream flows if the Tribe ceded all "right, title, and claim which they now have, or ever had, to all lands[?]" We have answered the question in the negative as supported by the historical documents. Accordingly, the district court did not err in granting summary judgment disallowing the claims of the Tribe and the United States to instream flows off of the Reservation.

3. The Tribe is entitled to rights to instream flows on the Reservation. However, it is not entitled to any instream flows off of the Reservation.

In sum, the district court correctly determined the entitlement to instream water rights. The Tribe is entitled to water rights on the Reservation. In the nomenclature previously used, this involves the two innermost concentric circles. The Tribe is entitled to control instream flows on the Reservation whether the land physically adjacent to the water is owned by the Tribe or not. However, the Tribe is not entitled to instream flows that are off of the Reservation. Those rights were extinguished when the Tribe conveyed all "right, title and claim which they now have or

ever had" to the United States in the 1891 Act of Congress.[20] 26 Stat. at 1027. As a result, the district court did not err in deciding the Tribe had an entitlement to instream water flows on the Reservation and in deciding the Tribe did not have an entitlement to off-Reservation instream flows.

**G.      The district court did not err in determining the priority date for reacquired lands for consumptive uses. However, the district court erred in determining the priority date for reacquired lands for nonconsumptive uses.**

In addition to determining what water rights the Tribe was entitled to, the district court also determined the priority date that would attach to each category of rights. In its summary judgment order, the district court determined that the Tribe's nonconsumptive water rights for fishing and hunting have a time immemorial priority date. However, in its order on reconsideration, the district court clarified this holding to find that "non-Indian successors cannot hold, appropriate or exercise non-diversionary or instream rights . . . . As a result, to the extent such rights are . . . for instream purposes, such rights would be lost through nonuse. Springs and wetlands as well as other rights lost to nonuse would carry a date of reacquisition priority date."

The United States argues that the priority date for water rights in seeps, springs, and wetlands for fishing purposes is time immemorial, regardless of whether those lands were temporarily not owned by the Tribe. The Tribe makes a similar argument, but also argues that consumptive water rights, such as those for irrigation, should have a priority date no later than the date-of-reservation.

The State argues that the district court did not err in concluding that the priority date for on-Reservation implied water rights that were alienated by the United States and then reacquired by the Tribe would have either a date-of-reacquisition or the date on which a state water right was perfected, whichever is earlier. The State argues further that any purposes implied by the setting aside of Reservation land ceased to remain when those lands were conveyed to non-Indians. The NIWRG adopted the arguments made by the State pursuant to I.A.R. 35(h).

In 1906, as a result of the Indian Appropriations Act, the federal government allotted to each tribal member 160 acres of Reservation land for the sole use and benefit of that

---

[20] As noted, Indian land cannot be conveyed without federal consent. However, because Congress approved the Tribe's cession of all "right, title, and claim which they now have, or ever had" off the Reservation, the conveyance was valid.

49

individual.[21] 34 Stat. at 335–36. Any surplus lands, which formed the majority of the Reservation, were then opened to non-Indians for homesteading.[22] 34 Stat. at 336. As a result of the Indian Appropriations Act (and its predecessor the General Allotment Act of 1887) non-Indian holdings on the Reservation vastly exceeded those of the Tribe, in terms of total acreage, due to homesteading, sale, and loss of Indian allotments from default. Ross R. Cotroneo & Jack Dozier, *A Time of Disintegration: The Coeur d'Alene and the Dawes Act*, 5 W. HIST. Q. 405, 411–18 (1974). Over the last few decades, the Tribe has reacquired a portion of the lands that were lost to non-Indians within the Reservation, due in part to the Indian Reorganization Act of 1934, Pub. L. No. 73-383, 48 Stat. 984.

In order to analyze this issue, it is important to distinguish between the types of lands that the Tribe reacquired. The first type, known as allotted lands, includes lands that were originally allotted to individual Indians under the Indian Appropriations Act that were then later sold to non-Indian purchasers. The second type includes lands opened to homesteading that were never claimed by non-Indians; these lands are known as surplus lands. The third and final type, known as homesteaded lands, includes lands opened to and homesteaded by non-Indians. It is this last category, homesteaded lands, that is at issue in these appeals.

Also, it is necessary to distinguish between nonconsumptive water use and consumptive water use. Nonconsumptive water use does not deplete or divert the supply of water. In contrast, consumptive water use occurs when water is removed from the available supply without its return to the water supply system (this includes groundwater claims).

1. <u>The two different approaches for consumptive water rights on reacquired land.</u>

The United States Supreme Court has not addressed what priority rights apply when a tribe reacquires lands. Two courts have addressed this issue and each has come to an opposite conclusion as to what priority date to assign to consumptive water rights on reacquired homesteaded land. The first approach was undertaken by the Ninth Circuit in *United States v. Anderson*, 736 F.2d 1358, 1362 (1984). In that case, the priority date was contingent upon what type of land was reacquired by the Tribe. *Id.* The second approach was undertaken by the

---

[21] The statute allotted 160 acres to every tribal "man, woman, and child." 34 Stat. at 335–36.

[22] Any land that was made available for sale, but never sold, was "restored to tribal ownership." Act of May 19, 1958, 72 Stat. 121. Those lands retain their original date-of-reservation priority date. *United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984).

Supreme Court of Wyoming in *Big Horn I*, 753 P.2d at 76. Under that approach, the priority date for water rights is not affected by intervening non-Indian ownership.

### a. The Ninth Circuit's approach.

The Ninth Circuit has held that when title to allotted lands passed from an Indian to a non-Indian, the Indian's consumptive water rights passed with it.[23] *Walton I*, 647 F.2d at 50. The court also held that the non-Indian successor assumed the Indian allottee's priority date, the date-of-reservation, for those consumptive rights. *Id.* at 49–50. The *Walton I* decision makes it clear that reserved water rights on allotted lands do not cease to exist merely because the land passed out of Indian ownership. *Id.* at 51. Thus, it follows that upon reacquisition, the Tribe is equally entitled to the original priority date, as long as the water right had not been lost due to nonuse. *Anderson*, 736 F.2d at 1362.

However, this rationale does not apply to lands that had been homesteaded. *Id.* at 1363. In *Anderson*, the Ninth Circuit held that homesteaders were not entitled to rely on the *Winters* doctrine for water rights. *Id.* (citing *Cal. Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 164 (1935)). Rather, the homesteader had to acquire a water right through the prior appropriation doctrine.[24] *Id.* at 1363. Because there were no *Winters* rights for the tribe to reclaim, it could not claim a date-of-reservation priority upon reacquiring the homesteaded land. *See id.*

Instead, the Ninth Circuit held that the tribe was entitled to the earlier of two possible priority dates for homesteaded lands reacquired by the tribe. *Id.* First, if there was a perfected state water right, which has not been lost to nonuse or abandonment, the water right transferred to the Tribe and the Tribe enjoyed the same priority date as the seller. *Id.* Second, when "the homesteader has no perfected water rights or has lost rights which were perfected, there are no rights to be regained by the Indians on reacquisition of the property." *Id.* Consequently, upon reacquisition by the Tribe, these consumptive water rights have a date of reacquisition priority date, rather than an original, date-of-the-reservation priority, because, as *Anderson* reasons, the lands are analogous to a new reservation. *Id.* ("We treat these lands in a manner analogous to that

---

[23] Nonconsumptive water rights are not transferable according to the Ninth Circuit. *Adair*, 723 F.2d at 1418 ("The hunting and fishing rights themselves belong to the Tribe and may not be transferred to a third party" and thus "no subsequent transferee may acquire that right of use or the reserved water necessary to fulfill that use.").

[24] The prior appropriation doctrine is loosely embodied in the phrase "first in time, first in right," which means the first appropriator of water to put it to beneficial use has the first claim to the water being put to use.

of a newly created federal reservation and find that the purposes for which *Winters* rights are implied arise at the time of reacquisition by the Tribe.").

b.   *The Supreme Court of Wyoming's approach.*

The Supreme Court of Wyoming addressed water rights for reacquired lands in both *Big Horn I* and *In re Gen. Adjudication of All Rights to Use Water in Big Horn Sys.* (hereafter *Big Horn IV*), 899 P.2d 848, 855 (1995). In *Big Horn I*, the court applied the same reasoning and holding as the Ninth Circuit as to reacquired, allotted lands ascribing to them a date-of-reservation priority. 753 P.2d at 114. However, *Big Horn I* did not distinguish between allotted lands reacquired and homesteaded land Indians reacquired, recognizing that all reacquired lands, as part of the original reservation, were reservation lands entitled to the same reserved water rights and thus entitled to the same priority date of the reservation's creation. *Id.* The Wyoming court in *Big Horn IV* reaffirmed this holding. *Big Horn IV,* 899 P.2d at 854–55.

The parties disagree about whether the Wyoming court's approach in *Big Horn I* is different from or consistent with *Anderson*. While *Big Horn I* is not as clear as it could be, it appears to hold that reacquired allotted land and reacquired land ceded for homesteading have the same priority date, the date-of-reservation. *See Big Horn I*, 753 P.2d at 114. Thus, the United States and the Tribe are correct that the *Big Horn* decisions did not distinguish between the type of land in determining priority dates for reacquired land. The decisions stand for the principle that all reacquired land receives a date-of-reservation priority date. *Id.* The *Big Horn* decisions are therefore not consistent with *Anderson*, as *Anderson* recognized different priority dates based on the type of land reacquired.

c.   *The Ninth Circuit's approach is more persuasive.*

The district court applied *Anderson* in this case. This means for allotted lands, the right to share in the reserved waters passes from the Indian allottee to the non-Indian buyer. If the non-Indian purchaser maintained those rights throughout his or her ownership, then upon reacquisition, the Tribe's priority date would be the date-of-Reservation. If the purchaser lost the water rights through nonuse or otherwise, the Tribe's priority date would be the date of reacquisition. For homesteaded land, if the homesteader perfected water rights that were in existence upon the Tribe's reacquisition, the Tribe would have the homesteader's priority date. If the perfected right had been lost due to nonuse or otherwise, the Tribe's priority date would be

the date of reacquisition. For consumptive water rights, the district court did not err in its reliance on *Anderson* and in establishing priority dates consistent with *Anderson*.

    2.   Aboriginal nonconsumptive uses carry a priority date of time immemorial.

Neither of these cases addressed nonconsumptive water rights. *See Big Horn I*, 753 P.2d at 99 (only awarding water for agricultural uses); *see also Anderson*, 736 F.2d at 1362. Thus, an unanswered question by any court is whether nonconsumptive water rights are affected by the loss and later reacquisition of lands by a tribe.

As explained above, when Reservation lands were held by allottees or homesteaders, rights to water associated with these lands depended on the lands' status. However, nonconsumptive water rights, such as those claimed here for seeps, springs, and wetlands, are different from consumptive water use. For example, nonconsumptive water rights may never be held by a non-Indian,[25] nor may they be appropriated under the traditional prior appropriation doctrine. Another difference is that nonconsumptive rights are held for the communal benefit of the Tribe. *Compare Colville Confederated Tribes v. Walton (*hereafter *Walton II*), 752 F.2d 397, 400 (9th Cir. 1985) ("This quantity of water, unrelated to irrigation, was not affected by the allotment of reservation lands and passage of title out of the Indians' hands."[26]), *with Walton I*, 647 F.2d at 47–48 ("a ratable share of . . . water reserved for irrigation" could be subject to individual ownership and transfer); *see Adair*, 723 F.2d at 1418. Further, nonconsumptive uses "may not be transferred to a third party" and thus "no subsequent transferee may acquire that right of use or the reserved water necessary to fulfill that use." *Adair*, 723 F.2d at 1418.

The district court understood these differences to mean that nonconsumptive water rights were lost due to nonuse and gave the Tribe a priority date of reacquisition for those rights. However, due to the unique nature of nonconsumptive water rights, the district court erred in this determination. For a court to find differently would impose a state law prior appropriation doctrine, which requires water to be put to beneficial use (and lost if not used), on the Tribe's nonconsumptive reserved water rights arising under and protected by federal law. Nonconsumptive federal reserved water rights have "no corollary in the common law of prior appropriations." *Id.* at 1411. Therefore, they are not subject to loss by nonuse. The Tribe's

---

[25] They can and are held by the State under Idaho statutes. *See, e.g.*, I.C. § 42-1501.

[26] "This quantity of water" refers to the water sufficient to establish a fishery to satisfy the fishing purposes of the tribe. *Walton II*, 752 F.2d at 400.

nonconsumptive reserved water rights therefore continued to exist on reacquired lands and are entitled to a time immemorial priority date.

## IV. CONCLUSION

For the foregoing reasons, the decisions of the district court are affirmed in part and reversed in part. We reverse the district court's decisions as follows: first, the district court improperly applied *New Mexico*'s primary-secondary distinction and instead should have allowed aboriginal purposes of plant gathering and cultural uses under the homeland purpose theory; second, the priority date associated with nonconsumptive water rights is time immemorial. We affirm the remainder of the district court's decisions and remand for proceedings consistent with this opinion. No costs are awarded.

Justices BRODY and BEVAN CONCUR.

BURDICK, Chief Justice, concurring in part and dissenting in part.

While I concur with the Majority opinion, I cannot concur with Section F(2). There, the Majority concludes that the Tribe "explicitly relinquished" their right to instream flows in off-reservation water by voluntary act. Because I believe that the Majority's analysis and conclusion on this issue are incorrect, and because I believe that conclusion is incompatible with the rest of the opinion, I respectfully dissent.

To be clear, I have no quibble with the opinion's analysis at large. The opinion goes through great lengths to detail the *Winters* doctrine and the accompanying canons of interpretation. The parties and this Court agree that the Reservation and any implied water rights were created by the Executive Order of 1873. Likewise, it's agreed that when Congress designated the Reservation, it reserved, by implication, the water necessary to achieve the purposes of the Reservation. And no one disputes that to determine the Reservation's purposes, this Court must look to "the 1873 documents (both the executive order and the agreement) and the current documents and circumstances (i.e., the Tribe's 1872 Petition)." The final ratification by Congress in 1891 "incorporated the original reservation as created in 1873 and no rights or purposes have been clearly abrogated by subsequent acts." Guided by the homeland purpose theory and an examination of the formative documents, this Court came to the correct conclusion that the United States reserved the following water rights for the Tribe:

(1) "consumptive uses for both domestic (including groundwater) and agriculture"; and

(2) "non-consumptive uses for hunting (wildlife habitat), *fishing (fish habitat)*, plant gathering (including seeps and springs), and cultural activities—so long as they can be established as aboriginal uses (i.e., uses of water predating the creation of the Reservation."

The upshot of all this is that Congress set aside the water necessary to achieve the purpose of fishing by providing instream, non-consumptive water rights to preserve the fish habitat. Because some of the fish species native to the Coeur d'Alene Lake spawn into the rivers and streams before returning to the Lake, Congress impliedly set aside the water necessary to maintain the fish habitat there, too. After all, one can't fish if there are no fish. And there are no fish if the fish can't spawn.

Where the Majority and I part company is their conclusion that the Tribe clearly, voluntarily, and unambiguously ceded their right to instreams flows that support the fish habitat in waters outside of the Reservation.

To properly understand why I disagree, it's worth remembering what exactly the Majority claims that the Tribe gave up. To the Tribe, water was of paramount importance:

> [T]he majority of the Tribe's population lived in villages located next to the Lake and rivers. The Tribe's proximity to the watercourses was no coincidence; the Lake and rivers provided resources that were essential to the Coeur d'Alenes' survival. The Tribe depended on the waterways for a year-round source of fish, small mammals, waterfowl and plant materials. The Tribe also depended on the waterways to facilitate the harvest of large mammals and to serve as a means of efficient transportation. Finally, the Tribe's spiritual, religious and social life centered around the Lake and rivers.

*United States v. Idaho*, 95 F. Supp. 2d 1094, 1101 (D. Idaho 1998). The fishery was the lifeblood of the Tribe. The fishery was a main source of food as the Tribe consumed resident trout and whitefish year-round. *Id.* at 1100. Among other methods of fishing, the Tribe constructed fish traps and weirs which were anchored in the bed and banks of the watercourses—sometimes spanning the width of a river. *Id.* Surplus fish were sometimes dried for later use or traded to other tribes. *Id.*

The cultural significance of this is reflected in the Tribe's negotiations with the United States. The Tribe emphasized the importance of the waterways and fishery to their way of life. For example, in their 1873 Petition, the Tribe explained their dissatisfaction with the land set aside for the Reservation in 1867 because the boundaries failed to include the river valleys. They stated these waterways were not included in their original petition because "in our ignorance, *we thought them a matter of course . . .*" and because the Tribe still "need[ed] to have some hunting

55

and fishing." *Id.* at 1103 (emphasis added). In the same vein, the 1873 Agreement expressly provided that off-reservation manipulation of water to the detriment of the Reservation was forbidden: "[T]he waters running into said reservation shall not be turned from their natural channel where they enter said reservation."

But according to the Majority, the Tribe explicitly signed away the rights they had taken great pains to protect. Considering the history and statements just mentioned, the evidence supporting the conclusion that the Tribe *clearly*, *voluntarily*, and *unambiguously* surrendered their water rights should be unmistakable. After all, "when a tribe and the Government negotiate a treaty, the tribe retains all rights not expressly ceded to the Government in the treaty so long as the rights retained are consistent with the tribe's sovereign dependent status." *United States v. Adair*, 723 F.2d 1394, 1413 (9th Cir. 1983) (*Adair I*) (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978)).  And, as the Majority points out, "Congress will not abrogate Indian rights without clear intent and an express agreement from the Indians." *Pocatello v. State*, 145 Idaho 497, 506, 180 P.3d 1048, 1057 (2008).

Yet, the Majority's conclusion is based solely on the following language from the Ratified Agreement of 1887:

> For the consideration hereinafter named, the said Coeur d'Alene Indians hereby cede, grant, relinquish, and quitclaim to the United States, all the right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation.

Where the Majority focuses on the "right, title, and claim" language, it glosses over the language that qualifies it—"*to all lands*." The Tribe ceded "right, title, and claim . . . *to all lands* outside the reservation." But does "lands" encompass water rights as well? It's important to remember that while water rights are property rights, they are usufructuary rights; a right to use the water. Let's also recall that in the 1873 Agreement, the Tribe and Congress referred to "the waters" when discussing whether water could be diverted before reaching the reservation. If the Tribe and Congress intended to include water rights in the 1887 Agreement, why not use the same language? Nothing in the 1887 Agreement hints that "lands" was intended to include water rights. Further examination reveals that "all lands in said territories" refers to a passage in prior section of the 1887 Agreement which states that the Tribe was in possession of "a large and valuable *tract of land* lying in the territories of Washington, Idaho, and Montana."

56

To the majority, "lands" plainly means "land and water." But it seems plain that when the parties said "lands," they meant land, and when the parties said "waters," they meant water. I reach this conclusion for a few reasons. First, as a practical matter, I don't think a contemporary reader would reach the Majority's conclusion based on the language used. Second, the Majority's conclusion inexplicably abandons the canons of construction we are required to use in interpreting these agreements. Third, to my mind, it is simply not possible that the Tribe would have understood "lands" to mean a relinquishment of any interest in water that flowed into the Reservation, but happened to lie on lands outside the Reservation. Lastly, the United States Supreme Court and the Ninth Circuit Court of Appeals have rejected the same "unambiguous" interpretation when presented with the same language. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 195 (1999); *Adair I*, 723 F.2d at 1414.

To begin, I would be hard-pressed to find that the term "lands" unambiguously encompasses water rights in a normal conveyance. The Oxford English Dictionary reveals nine definitions of the word "land." THE OXFORD ENGLISH DICTIONARY VIII 617–18 (2nd 1991). The primary definition reads "the solid portion of the earth's surface, as opposed to *sea*, *water*." *Id.* at 617. The definition for the plural, "lands," is "[t]erritorial possessions." *Id.* While this seems like the most appropriate definition, it offers little help to the Majority's conclusion because it makes no mention of water. In fact, of all the possible definitions, only *one* explicitly encompasses water: The legal definition. Even then, the legal definition at the time of the agreement only sometimes encompassed water: "Land in its most restricted legal signification is confined to arable ground . . . In its more wide legal signification land extends also to meadow, pasture, woods, moors, waters, &c." *Id.* (quoting 1839 Penny Cycle. XIII). This difference in parlance continues today: "When thinking of land, most speakers of the English language visualize the earth's surface. But in law, the word includes everything above and below the surface—even gases, liquids, and buildings." Garner, Bryan, *Garner's Dictionary of Modern Legal Usage* 514 (3rd ed. 2011). Granted, if this were a normal conveyance, then I could understand using the legal definition.

But this is not a normal conveyance. We are dealing, instead, with a Treaty between the United States and the Tribe signed in the late 1800's. This fact leads me to my second conclusion: The Court inexplicably abandons the canons of construction for Indian treaties on this issue.

57

The 1887 Treaty was one of many such treaties that the United States entered into during the 19th century. To best understand the circumstances of these treaties, it's helpful to look at how the Supreme Court of the United States characterized such negotiations during the era. On one side was the United States—a "powerful nation" with "representatives skilled in diplomacy" and "masters of a written language." *Jones v. Meehan*, 175 U.S. 1, 11 (1899). The representatives would "draw[] up" the agreements "in their own language" with an acute understanding of the "modes and forms of creating various technical estates known to their law." *Id.* This stood in stark contrast to the tribes seated at the other side of the negotiation table. They often had "no written language" and were "wholly unfamiliar with all the forms of legal expression." *Id.* Already at a disadvantage, the tribes' position was weakened further by the fact that their "only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States. . . ." *Id.* The Supreme Court admonished that these circumstances "must always" be kept in mind when interpreting such treaties. *Id.* at 10. After all, "the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side." *Washington v. Washington St. Comm'l Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675–76 (1979). Therefore, the treaty "*must* . . . be construed, *not according to the technical meaning of its words to learned lawyers*, but in the sense in which they would naturally be understood by the Indians." *Id.* (emphasis added).

For that reason, we must discard the *only* definition of "lands" that explicitly encompasses water because that definition is "the technical meaning of [the] word to learned lawyers." We are left with the question of whether the Tribe "naturally . . . underst[ood]" that it was giving up the right to maintain the vitality of its fishery when it surrendered "lands" outside the Reservation.

*This* is the juncture when we determine ambiguity.

All this leads me to believe that when the Tribe agreed to cede all claim of right to the "lands" outside the Reservation, it was not understood or fathomed that such cessation included the right to water necessary to maintain the fishery. Even if this is what the United States intended the language to mean when they drafted it, I remain unconvinced that this what was "naturally . . . under[stood]" by the Tribe. Even to a fluent English-speaking member of the Tribe, I have a hard time finding that such a surrender of rights would be "naturally understood"

in light of the various definitions of lands to a non-lawyer. I also have serious doubts that such a concept would have been adequately translated to the Tribe if no fluent English-speaking tribal members were present.

I'm in good company in my opinion that the Tribe did not "unambiguously" relinquish their right to instream uses when they ceded their claim of right "to all lands."

The United States Supreme Court rejected substantially the same argument when the state of Minnesota presented it (except with usufructuary fishing and hunting rights, rather than instream-flow rights). *Mille Lacs*, 526 U.S. at 195. There, Minnesota claimed that the following language unambiguously relinquished the Tribe's usufructuary rights:

> And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere.

*Id.* The Supreme Court noted that the language did not mention hunting or fishing rights and was "devoid of any language expressly mentioning—much less abrogating— usufructuary rights." *Id.* To determine whether that language abrogated the tribe's rights, the Court stated it would "look beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Id.* at 196. The Court found that the Treaty "was designed primarily to transfer Chippewa land to the United States, not to terminate Chippewa usufructuary rights." *Id.* The Court noted "[i]t is difficult to believe that in 1855, the Chippewa would have agreed to relinquish the usufructuary rights they had fought to preserve in 1837 without at least a passing word about the relinquishment." *Id.* at 198. The Court concluded that, "[a]t the very least, the historical record refutes the State's assertion that the 1855 Treaty 'unambiguously' abrogated the 1837 hunting, fishing, and gathering privileges" and, given this "plausible ambiguity[,]" the Court could "not agree with the State that the 1855 Treaty abrogated Chippewa usufructuary rights." *Id.* at 200.

While one may argue that *Mille Lacs* is distinguishable based on the exact nature of the right in question, the Ninth Circuit Court of Appeals' decision in *Adair I* precludes that reasoning because that case dealt with precisely the issue we're faced with here. *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983). There, the Ninth Circuit heard claims from the Klamath tribe

that their hunting and fishing right included an instream nonconsumptive right to support the health of their fishery. The *Adair I* court noted that when the Klamath Tribe "expressly ceded 'all [its] right, title and claim' to most of its ancestral domain," there was "no indication in the treaty, express or implied, that the Tribe intended to cede any of its interest in those lands it reserved for itself." *Id.* "Nor is it possible that the Tribe would have understood such a reservation of land to include a relinquishment of its right to use the water as it had always used it on the land it had reserved as a permanent home." *Id.* The Ninth Circuit continued: "[N]o language in the treaty . . . indicate[s] that the United States intended or understood the agreement to diminish the Tribe's rights in that part of its aboriginal holding reserved for its permanent occupancy and use." *Id.* This led to the conclusion that the treaty "is a recognition of the Tribe's aboriginal water rights and a confirmation to the Tribe of a continued water right to support its hunting and fishing lifestyle" on the reservation. *Id.*

*Adair I* also responded to Oregon's contention that the tribe no longer held the water right because the tribe no longer owned the land to which the right was appurtenant. Unpersuaded, the *Adair I* court found that this argument "misperceives the history and nature of the [tribe's] reserved water right." *Id.* at 1415 n.24. "[W]hen the Klamath Reservation was created and water was impliedly reserved for the benefit of the Tribe, the Indians owned appurtenant land. *Id.* In a treaty context, the issue was "whether these water rights, once reserved, are terminated by a transfer of the appurtenant land." The court referred to its prior precedent which held that the tribe's "hunting and fishing rights guaranteed by the treaty survived despite the land transfer. *Id.* (citing *Kimball v. Callahan*, 493 F.2d 564, 569 (9th Cir. 1974)). As a result, the court "refused" to "find that the water rights necessary to give meaning to these hunting and fishing rights have been lost because the Tribe has disposed of the appurtenant land . . . ." *Id.*

The water right here is much different than the usufructuary right to hunt and fish on the lands at issue in *Mille Lacs.* Whereas those rights required physical entry on the *lands* that the tribe ceded*,* an instream flow right is nonconsumptive and carries no right of entry. But much like *Mille Lacs*, the historical record in this case refutes the Majority's assertion that the 1887 Treaty "unambiguously" abrogated the Tribe's instream water rights. *Mille Lacs*, 526 U.S. at 200. Given the plausible ambiguity the historical record creates, I can't agree with the Majority that the 1887 Treaty abrogated the Tribe's instream-flow rights. Rather, much like the Ninth Circuit, I view the 1887 Treaty as "a recognition of the Tribe's aboriginal water rights and a

60

confirmation to the Tribe of a continued water right to support its . . . fishing lifestyle." *Adair I*, 723 F.2d at 1414. And I can't agree with the Majority because I find it difficult to think that "the water rights necessary to give meaning to these hunting and fishing rights have been lost because the Tribe has disposed of the appurtenant land . . . ." *Id.* at 1415, n.24.

The Majority seems to suggest that knowledge of "adfluvial" fish behavior is a recent invention. The only connection I can see for including this information is the insinuation that the United States' and the Tribe's arguments are post-hoc justifications for claiming more water rights than were contemplated at the time of the agreements. First, I will set aside for the moment the thought that if a people live in a region since time immemorial they might have a better understanding of the area's ichthyology than the Majority gives them credit for. Rather, my disagreement is with the insinuation. I think an instream water right claim to off-reservation water is much more practically viewed as aligning with the Reservation's purpose. What use are reserved water rights supporting a right to fish and the fishing habitat if part of that habitat can be affected or destroyed by a third party?

To conclude, the Tribe does not have in-stream, non-consumptive water rights to all the waters on the lands they ceded away in the Washington, Montana, and Idaho Territories. However, the Tribe has in-stream water rights for the health and maintenance of their fishery. Because their fishery includes fish that spawn in the tributaries of Lake Coeur d'Alene, the instream water rights which protect the fish habitat extend as far as the fish do. I have trouble envisioning the United States reserving the Reservation to "be held forever . . . as homes" for the Tribe without the water necessary for the fish to spawn, rear, and migrate.

Justice HORTON CONCURS.